**Frank MARRAPESE**

v.

**STATE OF RHODE ISLAND et al.**

**Civ. A. No. 80–0167.**

United States District Court,
D. Rhode Island.

Oct. 10, 1980.

John F. Cicilline, Providence, R. I., for plaintiff.

Eileen G. Cooney, Asst. Atty. Gen., Providence, R. I., for defendants.

OPINION AND ORDER

PETTINE, Chief Judge.

This case is one of several now before the Court in which the State of Rhode Island is a named defendant in an action under Sec-

tion 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983. It presents the difficult and important question whether Rhode Island can be required to appear in court and defend plaintiff's § 1983 claim on the theory that § 9–31–1 of the Rhode Island General Laws[1] manifests a waiver of the State's Eleventh Amendment immunity. After careful study of the issues involved, this Court concludes that R.I.G.L. § 9–31–1 does evidence a waiver of Eleventh Amendment immunity in cases in which the alleged constitutional violation arises from activities that are in the nature of tort at common law. Therefore, the State's motion to dismiss is denied.

According to the plaintiff's complaint, on or about March 19, 1975, officers of the Rhode Island State Police during the course of a criminal investigation applied to the plaintiff's skin a chemical solution containing benzidine. The plaintiff alleges that it is the official custom and policy of the Rhode Island State Police to use benzidine solution to test for the presence of blood even though, according to the plaintiff, benzidine is a known carcinogen that is rapidly absorbed through the skin. Claiming that this incident violated his Fourth, Sixth, Eighth, Ninth and Fourteenth Amendment rights and caused him physical and mental harm, the plaintiff requests $100,000 in compensatory and punitive damages from various members of the State Police force and from the State of Rhode Island.

■ The plaintiff seeks damages from the State itself, damages "measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." *Edelman v. Jordan*, 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974). As such, his claim falls squarely within the ban of the Eleventh Amendment,[2] unless Congress has validly abrogated Rhode Island's immunity, *see, e. g., Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), or unless Rhode Island has consented to suit, *see, e. g., Parden v. Terminal Railway*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). In light of *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), the plaintiff does not suggest that any congressional abrogation of immunity operates here.[3] Rather, he argues that Rhode Island has waived its constitutional immunity to suit in federal court by enacting R.I.G.L. § 9–31–1:

> Tort liability of the state—The State of Rhode Island and any political subdivision thereof, including all cities and towns, shall, subject to the period of limitations set forth in § 9–1–25, hereby be liable in all actions of tort in the same manner as a private individual or corporation, provided however, that any recovery in any such action shall not exceed the monetary

---

1. Tort liability of state.—The state of Rhode Island and any political subdivision thereof, including all cities and towns, shall, subject to the period of limitations set forth in § 9–1–25, hereby be liable in all actions of tort in the same manner as a private individual or corporation, provided, however, that any recovery in any such action shall not exceed the monetary limitations thereof set forth in the chapter.
R.I.G.L. § 9–31–1 (1970 & 1978 Supp.).

2. The Eleventh Amendment provides:
The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
Although by its terms not strictly applicable to suits against the state by its own citizens, the Amendment has been construed to include such actions. *See Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974) and cases therein cited. Injunctive or declaratory relief is available against the state through the device of suing a state official in his or her official capacity. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). A judgment that, as a practical matter, places a monetary burden on the state treasury is permissible so long as the burden is ancillary to prospective relief. *E. g., Hutto v. Finney*, 437 U.S. 678, 690, 98 S.Ct. 2565, 2573–74, 57 L.Ed.2d 522 (1978); *Milliken v. Bradley*, 433 U.S. 267, 289–90, 97 S.Ct. 2749, 2761–62, 53 L.Ed.2d 745 (1977).

3. *Quern v. Jordan* reaffirmed the holding of *Edelman v. Jordan* that § 1983 was not intended to override the states' Eleventh Amendment immunity. 440 U.S. 332, 341 (1979).

limitations thereof set forth in the chapter.[4]

Before examining the import of § 9–31–1, the Court must first determine whether *Quern v. Jordan* forecloses all possibility of maintaining a § 1983 claim against the State, regardless of whether it has consented. Justice Brennan has read the majority opinion in *Quern* as effectively establishing that states are not "persons" within the meaning of § 1983, *see* 440 U.S. at 350–351, 99 S.Ct. at 1150–1151 (Brennan, J., concurring in the judgment). At least two federal courts have agreed with his interpretation. *See Brown v. Supreme Court of Nevada*, 476 F.Supp. 86, 89 (D.Nev.1979); *Thompson v. New York*, 487 F.Supp. 212, 226 (N.D.N.Y.1979). If this is the true significance of *Quern*, then any inquiry into Rhode Island's consent is, of course, senseless. The mere fact of a state's consent cannot expand the class of natural and artificial entities subject to § 1983. *Cf. Johnson v. Texas Dept. of Corrections*, 373 F.Supp. 1108, 1110 (S.D. Tex.1974); *S. J. Groves v. New Jersey Turnpike Authority*, 268 F.Supp. 568, 571 (D.N.J.1967) (state's consent cannot create diversity jurisdiction). A close reading of *Quern* reveals, however, that another interpretation of the majority opinion is possible.

In *Monell v. New York Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court undertook a thorough exegesis of § 1983, considering the language of § 1 of the Civil Rights Act of 1871 against the backdrop of contemporary legal thought and the recently enacted Dictionary Act.[5] As a result of this examination, the Court concluded that, "[s]ince there is nothing in the 'context' of § 1 of the Civil Rights Act calling for a restricted interpretation of the word 'person,' the language of that section should prima facie be construed to include 'bodies politic' among the entities that could be sued." 436 U.S. at 689–90 n.53, 98 S.Ct. at 2035 n.53. The Court then overruled that portion of *Monroe v. Pape*, 365 U.S. 167, 187–92, 81 S.Ct. 473, 484–86, 5 L.Ed.2d 492 (1961) which held that municipalities were not "persons" for the purposes of § 1983.

After *Monell*, there was considerable speculation about whether the Court's reevaluation of § 1983 would extend to states as well as municipalities.[6] Any suggested inclusion of states within the class of potential § 1983 defendants raised Eleventh Amendment questions not presented by the case of local governmental units.[7] The Supreme Court had already affirmed, however, that Congress possessed the power under § 5 of the Fourteenth Amendment to override the states' constitutional immunity.[8] *See Fitzpatrick v. Bitzer*, 427 U.S. at

---

4. The monetary limitations referred to in § 9–31 1 are found in § 9–31–2:

 Limitations of damages–State.–In any tort action against the state of Rhode Island, any damages recovered therein shall not exceed the sum of fifty thousand dollars ($50,000); provided, however, that in all instances in which the state was engaged in a proprietary function in the commission of such tort, or in any situation whereby the state has agreed to indemnify the federal government or any agency thereof for any tort liability, the limitation on damages set forth in this section shall not apply.

5. The pertinent portion of the Dictionary Act provides:

 [I]n all acts hereafter passed . . . the word "person" may extend and be applied to bodies politic and corporate . . . unless the context shows that such words were intended to be used in a more limited sense.
 Act of February 25, 1871, § 2, 16 Stat. 431.

6. *Compare, e. g., Skehan v. Board of Trustees*, 590 F.2d 470, 488–91 (3d Cir. 1978), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (states are not "persons" despite *Monell*) *with Aldrige v. Turlington*, 47 U.S.L.W. 2370 (N.D. Fla. Nov. 17, 1978) (states are "persons" after *Monell*).

 As Justice Brennan points out in *Quern*, states were considered "bodies politic" in 1871. 440 U.S. at 356, 99 S.Ct. at 1153 (Brennan, J., concurring in the judgment). Thus, it is plausible to assume that they are encompassed within the word "person" as defined by the Dictionary Act.

7. Municipalities are not shielded by the Eleventh Amendment. *Monell v. New York Dept. of Social Services*, 436 U.S. at 690 n. 54, 98 S.Ct. at 2035 n. 54.

8. That § 1983 was adopted pursuant to Congress' § 5 power appears indisputable. *See Quern v. Jordan*, 440 U.S. at 351 n. 3, 99 S.Ct.

456, 96 S.Ct. at 2671. Thus, the crucial question was whether, in light of *Monell*'s reexamination of the language and legislative history of § 1983, the Court would reevaluate its conclusion in *Edelman v. Jordan* that Congress had not intended to exercise that power.

Against this background, *Quern* was decided. Justice Rehnquist's opinion, while emphatic in reasserting the Court's belief that Congress had not intended to abrogate the states' immunity through § 1983, *see* 440 U.S. at 345, conspicuously avoided any statement that the term "person" did not include "state."[9] Stated precisely, *Quern* concluded only that the Congress which enacted § 1983 did not intend to *force* the states to answer in federal court for their constitutional violations. Of itself, this holding does not mandate the further conclusion that the 42d Congress did not intend to *allow* the states to answer in federal court for their constitutional violations *if* they consented to do so. The alternate interpretation of *Quern*, then, would recognize that the word "person," when considered in light of the Dictionary Act and the legislative history of § 1983, is broad enough to encompass the state as a "body politic and corporate."[10] Limiting the practical effect of this construction would be the caveat that the statute leaves untouched Eleventh Amendment immunity, so that a state is not compellable to respond to § 1983 claims in federal court.

Suggesting that Congress included the states within the scope of § 1983 only to leave them free to decline to answer for any constitutional wrongdoing appears strained, if not actually illogical. However,

it seems to this Court that the consequences of adopting Justice Brennan's interpretation of *Quern* are equally unreasonable. The legislative history reveals that proponents of § 1983 had the highest ambitions for the scope and effectiveness of its remedial powers. Representative Bingham, author of § 1 of the Fourteenth Amendment, argued in favor of the passage of § 1983:

> The States never had the right, though they had the power, to inflict wrongs upon free citizens by a denial of the full protection of the laws .... [And] the States did deny to citizens the equal protection of the laws, they did deny the rights of citizens under the Constitution, and except to the extent of the express limitations upon the States, as I have shown, the citizen has no remedy .... They took property without compensation, and he had no remedy. They restricted the freedom of the press, and he had no remedy. They restricted the freedom of speech, and he had no remedy. They restricted the rights of conscience, and he had no remedy .... Who dare say, now that the Constitution has been amended, that the nation cannot by law provide against all such abuses and denials of right as these in the States and by States, or combinations of persons?

Cong. Globe, 42d Cong., 1st Sess.App. 85 (1871), *quoted in Monell v. New York Dept. of Social Services*, 436 U.S. at 685 n. 45, 98 S.Ct. at 2033 n. 45.

Senator Edmunds, manager of the bill in the Senate, characterized § 1983 as "really reenact[ing] the Constitution." Cong. Globe, 42d Cong., 1st Sess. 569 (1871), *quot-*

---

at 1150 n. 3. (Brennan, J., concurring in the judgment).

**9.** The Court's refusal to cast its discussion in the form of a "person" analysis is all the more striking in light of Justice Brennan's vehement insistence in his concurring opinion that the critical question was precisely the meaning of the word "person."

**10.** This point has been amply demonstrated by Justice Brennan's review of the legislative history of the 1871 Act. *See Quern v. Jordan*, 440 U.S. at 355–57, 99 S.Ct. at 1152–1154 (Brennan, J., concurring in the judgment); *Hutto v. Fin-*

*ney*, 437 U.S. 678, 700–04, 98 S.Ct. 2565, 2578–2581, 57 L.Ed.2d 522 (1978) (Brennan, J., concurring). *See generally Monell v. New York Dept. of Social Services*, 436 U.S. at 665–95, 98 S.Ct. at 2022–2036. As noted above, the majority opinion in *Quern* rejects only Justice Brennan's view that the legislative history supports a finding of congressional intent to abrogate the states' Eleventh Amendment immunity. It does not appear to agree with him that the immunity question is necessarily synonymous with the "person" inquiry.

ed in *Monell v. New York Dept. of Social Services,* 436 U.S. at 685, 98 S.Ct. at 2033. In interpreting a statute which "was intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights," *Monell v. New York Dept. of Social Services,* 436 U.S. at 700–01, 98 S.Ct. at 2041, it would seem strained, if not actually illogical, to conclude that Congress meant to exclude the governmental entities which, being most powerful, could pose the greatest threat to the constitutional rights of citizens, *even when those entities consented to suit.*

■ Faced, then, with two possible interpretations—neither of which is particularly satisfactory—this Court accepts the one that gives greatest latitude to § 1983's broad remedial purpose. It concludes that the states are "persons" potentially liable for constitutional deprivations inflicted through official custom and policy, but that, because Congress has not exercised its § 5 powers to abrogate Eleventh Amendment immunity, each state must consent to the imposition of such liability. This interpretation allows victims of unconstitutional activity the largest possibility for redress, while exacting little cost in terms of federalism. Be-

cause there is no forced waiver, each state maintains ultimate control over its own potential liability.[11] Moreover, this interpretation is consistent with earlier cases in which the Supreme Court seems to have assumed that a state could consent to § 1983 liability. *See, e. g., Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3058, 57 L.Ed.2d 1114 (1978) (per curiam); *Edelman v. Jordan,* 415 U.S. at 671–74, 94 S.Ct. at 1358–1359.[12] Therefore, this Court holds that Rhode Island is a "person" within the meaning of § 1983.

■ Having found that Rhode Island can be sued under § 1983 with its consent, this Court must make the more difficult determination of whether Rhode Island has in fact consented. The relinquishment of Eleventh Amendment rights, like the waiver of any constitutional right, is not lightly to be inferred. *See Petty v. Tennessee–Missouri Bridge Commission,* 359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959). In accordance with the standard of *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), this Court must find that there has been an "intentional relinquishment or abandonment of a known right or privilege." The most obvious evidence of such relinquishment would be an

---

11. The concept of a "person" whose activities are subject to the law but who may be held liable only for those violations for which he chooses to answer is not the legal oddity it first appears to be. Cases in which a wrongdoer is outside the personal jurisdiction of the court present that very situation. To the extent that the Eleventh Amendment is regarded as jurisdictional in nature, *see Edelman v. Jordan,* 415 U.S. at 678, 94 S.Ct. at 1363, it is not implausible to frame the issue in personal jurisdictional terms: Congressional intent in § 1983 was that states be governed by the statute's substantive requirements but be answerable in federal court for its violation only when they consent to that court's exercise of "personal jurisdiction."

In any event, Congress' refusal to force a waiver of Eleventh Amendment immunity would not necessarily render meaningless the inclusion of states within the ambit of § 1983 even in cases where voluntary waiver was not forthcoming. In states where sovereign immunity has been legislatively or judicially abrogated, § 1983 plaintiffs could take their claims against the state into state court.

12. In *Alabama v. Pugh,* the Court dismissed a § 1983 claim against the State of Alabama, saying:

> There can be no doubt, however, that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit.
> 438 U.S. 781, 782, 98 S.Ct. 3057, 3058, 57 L.Ed.2d 1114 (1978) (per curiam) (citations omitted).

The majority opinion in *Quern* quotes this language, apparently with approval. 440 U.S. at 340, 99 S.Ct. at 1144–1145. Since, as noted above, the issue of consent is irrelevant if the state is not a "person" within § 1983, *Quern*'s reference to *Pugh* seems to support the interpretation adopted by this Court today. At least two federal courts have reached the consent issue in post-*Quern* § 1983 actions against states, stating or implying that there would be jurisdiction if the state had consented. *See Beck v. California,* 479 F.Supp. 392, 396 (C.D. Cal.1979); *Savage v. Pennsylvania,* 475 F.Supp. 524, 529–31 (E.D.Pa.1979).

explicit, statutory statement that Rhode Island consents to be sued in the federal courts. The plaintiff cannot point to such a statement, but he urges that this Court can find an Eleventh Amendment waiver implicit in R.I.G.L. § 9–31–1, in which Rhode Island consents to answer for tortious conduct "in the same manner as a private person or corporation." [13]

In *Edelman v. Jordan*, the Supreme Court declared that an Eleventh Amendment waiver must be evidenced either "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." 415 U.S. at 673, 94 S.Ct. at 1361. This standard, though readily stated, is not so easily applied. *Edelman* appears to admit of the possibility of an implied waiver.[14] Yet, it is hard to imagine any statutory language short of an explicit waiver that would literally "leave *no* room

for *any other* reasonable construction." Perhaps, then, *Edelman* means that, as a practical matter, nothing less than an express waiver will do. If so, it is obvious that Rhode Island has not relinquished its Eleventh Amendment rights.

The Supreme Court has recently confirmed, however, that waiver of a constitutional right need not be express, so long as the "particular facts and circumstances surrounding [the] case" evince a voluntary relinquishment made with knowledge of the existence of the right. *See North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).[15] Moreover, in the Eleventh Amendment area specifically, the Court has found Congressional abrogation of the states' constitutional immunity in something less than an overt declaration of legislative intent. *See Hutto v. Finney*, 437 U.S. 678, 693–97 and n.27, 98 S.Ct. 2565, 2575–2577 and n.27, 57 L.Ed.2d 522 (1978).

**13.** One interesting issue presents itself at the threshold of this inquiry. This Court must examine the meaning of R.I.G.L. § 9–31–1 to determine whether the State, in that statute, waives its Eleventh Amendment rights. Is, then, the question presented here one of state law or one of federal law?

On the one hand, interpretation of a state statute is prima facie an issue of state law. On the other hand, innumerable cases agree that the evaluation of words or conduct alleged to constitute a waiver of constitutional rights is always a federal question. *See, e. g., Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 423 (1977); *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969); *Fay v. Noia*, 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963). Certain language in *Parden v. Terminal Railway*, 377 U.S. 184, 194–96, 84 S.Ct. 1207, 1214–15, 12 L.Ed.2d 233 (1964), seems to support the former interpretation. *See also Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 465–66 n.8, 65 S.Ct. 347, 351 n.8, 89 L.Ed. 389 (1945). Accordingly, some lower federal courts have considered the construction of a consent-to-suit statute a question governed by state law in these circumstances. *See Flores v. Norton & Ramsey Lines, Inc.*, 352 F.Supp. 150, 152 (W.D.Tex.1972); *S. J. Groves & Sons v. New Jersey Turnpike Authority*, 268 F.Supp. 568, 573 (D.N.J.1967). However, *Edelman v. Jordan*'s definition of an Eleventh Amendment waiver standard, *see* text *infra*, appears to establish waiver as a question of federal law. This Court has decided to approach the issue as a federal question. That decision was made

easier by the conclusion that what little Rhode Island caselaw there is on § 9–31–1 does not provide much guidance on the precise question now before the Court. Certainly, the cases do not contradict the holding reached today. *See* discussion of *Calhoun v. City of Providence*, *infra*. Thus, it made no real difference which way the issue was characterized.

**14.** This would be consistent with earlier cases in which the Supreme Court was willing at least to consider that an Eleventh Amendment waiver might be found in consent-to-suit statutes that made no overt reference to federal courts. *See* text *infra*.

**15.** *Butler* involved a criminal defendant's waiver of his right to have counsel present during custodial interrogation. Justice Blackmun, who was the swing vote, concurred with the "assumption" that the Court was not suggesting that *Miranda* rights were of constitutional dimension. Whether or not that assumption was justified, the Court's opinion certainly implies that even core constitutional rights may be relinquished without express language of waiver:

Even when the right so fundamental as that to counsel at trial is involved, the question of waiver must be determined on "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

99 S.Ct. at 1758, *quoting Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. at 1023.

Assuming, then, that there can be a waiver by implication, and recognizing that anything less than an express statement will of necessity contain some ambiguity, this Court must analyze the significance of § 9–31–1 in light of the principles underlying the Eleventh Amendment.

■ It is well–established that a state's waiver of sovereign immunity from suit in its own courts is not *per se* a waiver of constitutional immunity from suit in federal court. *See Edelman v. Jordan*, 415 U.S. at 677 n.19, 94 S.Ct. at 1363 n.19; *Petty v. Tennessee–Missouri Bridge Commission*, 359 U.S. at 276, 79 S.Ct. at 787; *Ford Motor Co. v. Department of the Treasury*, 323 U.S. 459, 465, 65 S.Ct. 347, 351, 89 L.Ed. 389 (1945). This does not mean, of course, that a consent–to–suit statute might not relinquish both types of immunity. The Supreme Court has several times examined such statutes to determine whether they included an Eleventh Amendment waiver. Most of these cases were actions by state residents seeking relief from taxes exacted under allegedly unconstitutional circumstances. *See, e. g., Kennecott Copper Corp. v. State Tax Commission*, 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946); *Ford Motor Co. v. Department of the Treasury*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); *Great Northern Insurance Co. v. Read*, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944); *Chandler v. Dix*, 194 U.S. 590, 24 S.Ct. 766, 48 L.Ed. 1129 (1904); *Smith v. Reeves*, 178 U.S. 436, 20 S.Ct. 919, 44 L.Ed. 1140 (1900). In these cases, the plaintiffs were uniformly unsuccessful in arguing that the state had waived its Eleventh Amendment immunity merely by establishing a procedure whereby it could be sued to recover excess taxes. The Court was understandably reluctant to condone federal court intervention in a state's taxing programs without some very clear indication of the state's acquiescence.

The Court's reasons were twofold. The first was rooted in a concern related to that which underlay the doctrine of *Pullman* abstention:[16] the "initial interpretation of the meaning and application of a state statute would have to be made by a federal court without a previous authoritative interpretation of the statute by the highest court of the State." *Kennecott Copper Corp. v. State Tax Commission*, 327 U.S. at 579, 66 S.Ct. at 748. *See also Ford Motor Co. v. Department of the Treasury*, 323 U.S. at 470, 65 S.Ct. at 353. The second reason counselling against readiness to find an Eleventh Amendment waiver was a recognition of "the direct impact of such litigation upon [the state's] finances." *Kennecott Copper Corp. v. State Tax Commission*, 327 U.S. at 577, 66 S.Ct. at 747. Before sanctioning federal court involvement in state tax matters, the Court demanded "a clear declaration of the state's intention to submit its fiscal problems to other courts than those of its own creation." *Great Northern Insurance Co. v. Read*, 322 U.S. at 54, 64 S.Ct. at 877, *quoted in Ford Motor Co. v. Department of the Treasury*, 323 U.S. at 465, 65 S.Ct. at 351. Concern for the fiscal autonomy of the states has carried through into modern Eleventh Amendment cases, so that the principle that the Eleventh Amendment protects state treasuries from involuntary raids by the federal courts has become a central tenet of Eleventh Amendment jurisprudence. *See, e. g., Edelman v. Jordan*, 415 U.S. at 673, 94 S.Ct. at 1360 (quoting above statement from *Great Northern Insurance Co.*); *Jagnandan v. Giles*, 538 F.2d 1166, 1176 (5th Cir. 1976), *cert. denied*, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083; *Incarcerated Men of Allen County Jail v. Fair*, 507 F.2d 281, 288 (6th Cir. 1974). The importance of this principle to the waiver inquiry is confirmed by the

---

**16.** In *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Supreme Court ordered the trial court to abstain from deciding constitutional questions presented in the case until the state court had an opportunity to decide critical questions of state law. In order to avoid involving the federal court in a premature, and perhaps unnecessary, foray into constitutional issues, the Court felt it desirable to first obtain from the highest state court an authoritative answer to unsettled and difficult state law questions. The Eleventh Amendment tax cases presented much the same situation. If the challenged tax assessment turned out to be incorrect as a matter of state law, the constitutional question would, of course, disappear.

Court's suggestion in recent Eleventh Amendment cases that there is a correlation between the magnitude and unexpectedness of the potential monetary burden on the state and the degree of explicitness required before abrogation of Eleventh Amendment protection will be found. *See Quern v. Jordan*, 440 U.S. at 344–45 n.16, 99 S.Ct. at 1147 n.16; *Hutto v. Finney*, 437 U.S. at 697 n.27, 98 S.Ct. at 2577 n.27.

■ On discerning the presence of either of these two reasons for caution–that is, the necessity of federal court interpretation of a complex state statutory or administrative scheme, or a serious and unanticipated threat to a state's fiscal integrity–the Court has been very sensitive to even the slightest indication that a state's waiver of sovereign immunity was not meant also to encompass a waiver of Eleventh Amendment immunity. It has considered whether other statutory or constitutional provisions evince a policy against state consent to federal court jurisdiction. *See, e. g., Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 3058, 57 L.Ed.2d 1114 (1978) (Alabama constitutional provision).[17] *Cf. Nevada v. Hall*, 440 U.S. 410, 412–413 n.2, 99 S.Ct. 1182, 1184 n.2, 59 L.Ed.2d 416 (1978) (Nevada limits consent to its own courts.) It has also determined

whether the state has explicitly consented to federal jurisdiction in other statutes. The fact that a state expressly waives its constitutional immunity in certain contexts militates against finding an implied waiver in other contexts. *See, e. g., Kennecott Copper Corp. v. State Tax Commission*, 327 U.S. at 579, 66 S.Ct. at 748 (certain Utah statutes refer to federal courts).[18] The Court has also refused to find waiver when the state statute incorporates a set of procedural requirements and restrictions that could not be satisfied–or at least would not be binding on–a federal court sitting in the state. These include instructions on where venue is to be laid and directions to use the state's rules of civil procedure. *See, e. g., Ford Motor Co. v. Department of the Treasury*, 323 U.S. at 465, 65 S.Ct. at 351 (contract claims against Indiana must be brought in one county); *Great Northern Insurance Co. v. Read*, 322 U.S. at 54–55, 64 S.Ct. at 876–877 (detailed state procedure for obtaining relief from tax assessments); *Smith v. Reeves*, 178 U.S. at 441, 20 S.Ct. at 921 (procedural requirements; suits in Sacramento County); *Chandler v. Dix*, 194 U.S. at 592, 24 S.Ct. at 766 (procedures and costs).[19]

17. Lower federal courts have followed suit. *See, e. g., Lenoir v. Porters Creek Watershed District*, 586 F.2d 1081, 1091–92 (6th Cir. 1977) (Tennessee constitution requires affirmative authorization); *Scott v. Board of Supervisors of Louisiana State University*, 336 F.2d 557, 558–59 & n.2 (5th Cir. 1964) (Louisiana constitution limits suits to state courts); *Knox v. Regents of University of Wisconsin*, 385 F.Supp. 886, 887–88 (E.D.Wisc.1975) (Wisconsin constitution requires affirmative authorization); *Ruman v. Commonwealth of Pennsylvania Department of Revenue*, 462 F.Supp. 1355, 1359 (M.D.Pa.), *aff'd*, 612 F.2d 574 (1979) (statute says no Eleventh Amendment waiver).

18. Lower federal courts have reached a similar conclusion when a statute specifies that suit is to be brought in the state courts. *See, e. g., McDonald v. State of Illinois*, 557 F.2d 596, 600–01 (7th Cir. 1977), *cert. denied*, 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 453 (Illinois court of claims has exclusive jurisdiction); *Harris v. Tooele County School District*, 471 F.2d 218, 220–21 & n.2 (10th Cir. 1973) (Utah's district courts have exclusive jurisdiction); *Williams v. Eaton*, 443 F.2d 422, 427–28 (10th Cir. 1971) (Wyoming courts have exclusive jurisdiction);

*Hernandez v. Whitesell*, 462 F.Supp. 569, 574 (E.D.Pa.1978) (Pennsylvania commonwealth courts have exclusive jurisdiction); *Medicenters of America, Inc. v. Virginia*, 373 F.Supp. 305, 307 (E.D.Va.1974) (statute names certain Virginia courts); *Alaska v. The O/S Lynn Kendall*, 310 F.Supp. 433, 434 (D.Ala.1970) (Alaska Superior court is to be site of suits).

19. Most lower federal court cases are in accord. *See, e. g., Riggle v. California*, 577 F.2d 579, 585–86 (9th Cir. 1978) (venue set in California county court); *Martin v. University of Louisville*, 541 F.2d 1171, 1176 n.5 (6th Cir. 1976) (tort claims to be heard by Board of Claims; contract claims in a particular Kentucky circuit court); *DiPietro v. Garden State Racing Association*, 463 F.Supp. 574, 577 (E.D. Pa.1978) (New Jersey law applied; statute requires use of New Jersey procedure rules). *But see Flores v. Norton & Ramsey Lines, Inc.*, 352 F.Supp. 150, 152–54 (W.D.Tex.1972) (court finds Eleventh Amendment waiver despite statute's laying venue in county where cause of action arose).

With these principles and guidelines in mind, this Court must consider R.I.G.L. § 9–31–1 and the "particular facts and circumstances" surrounding its enactment. Until 1970, Rhode Island adhered strictly to all varieties of governmental immunity. *See Markham v. State of Rhode Island*, 99 R.I. 650, 210 A.2d 146 (1965); *Quince v. State of Rhode Island*, 94 R.I. 200, 179 A.2d 485 (1962); *Miller v. Clarke*, 47 R.I. 13, 129 A. 606 (1925) (municipal immunity); *Wixon v. Newport*, 13 R.I. 454, 43 Am.Rep. 35 (1881) (same). In order to recover from the State, or from a local government unit, a plaintiff had to obtain special enabling legislation from the General Assembly. Such private bills gave the State's consent to suit, subject to various restrictions. The bills usually set an arbitrary limit on the possible damage award. *See Quince v. State of Rhode Island*, 94 R.I. at 205, 179 A.2d at 486. Occasionally, a bill even fixed the recoverable sum to the penny. *See, e. g., Markham v. State of Rhode Island*, 99 R.I. at 651, 210 A.2d at 147. These bills might specify in which state court the action was to be brought, direct that trial be had without a jury, and even restrict the court's jurisdiction to the decision of certain designated questions. *See id.* As late as 1962, the Rhode Island Supreme Court, while admitting that it was confronted with a case of "official conduct amounting to an outrage," warned the plaintiff that the special resolution under which he sued was "an act of grace voluntarily giving legal sanction to an otherwise unenforceable moral obligation." *Quince v. State of Rhode Island*, 94 R.I. at 203, 179 A.2d at 486.

Then, in 1970, the Rhode Island Supreme Court decided *Becker v. Beaudoin*, 106 R.I. 562, 261 A.2d 896, in which it was confronted with a challenge to the continued appropriateness of the doctrine of municipal immunity. After reviewing the asserted justifications for immunity, and pointing to the growing disinclination of other state courts to adhere to it, the Court decided that "the doctrine should no longer be given judicial approbation." *Id.* at 569, 261 A.2d at 900.

Viewing municipal immunity as a judicially created doctrine, the Court determined that it could be judicially abrogated. It recognized, however, that the Rhode Island legislature had the superior capability "to weigh social and economic factors and to provide for limitations on and regulation of actions brought to recover" against municipalities. *Id.* at 570, 261 A.2d at 901. It therefore invited the General Assembly to "provide for such limitations on assertions of the right and to regulate the prosecution of claims thereunder." *Id.* at 571–72, 261 A.2d at 901. The Court decided that all actions henceforth brought against municipalities would be subject to any subsequently–enacted restrictions. The Court carefully delineated the scope of its ruling, stating, "It is to be understood that this decision does not in any manner abolish or limit the sovereign immunity that inheres in the state itself." *Id.* at 572, 261 A.2d at 901–02.

Later that year, the General Assembly enacted P.L.1970, ch. 181 § 2 (codified at R.I.G.L. §§ 9–31–1 through 9–31–7), dealing with governmental immunities. In response to the Rhode Island Supreme Court's suggestion, § 9–31–1 sets a $50,000 ceiling on damages recoverable against municipalities for harm arising from the performance of governmental functions.[20] The General Assembly went beyond *Becker v. Beaudoin*, however, and also adopted the sweeping language of § 9–31–1:

> Tort liability of state.–The state of Rhode Island and any political subdivision thereof, including all cities and towns, shall, subject to the period of limitations set forth in § 9–1–25, hereby be liable in all actions of tort in the same manner as a private individual or corporation, provided however, that any recovery in any such action shall not exceed the monetary limitations thereof set forth in the chapter.

Contrary to its prior practice in enacting special resolutions, the General Assembly placed few conditions on the State's consent to suit. Sections 9–31–1 through 9–31–7 contain no directions as to venue or proce-

---

**20.** This damage limitation does not apply when the municipality was engaged in a proprietary activity at the time the tort was committed.

R.I.G.L. § 9–31–2. The General Assembly can, by special act, authorize damages in excess of $50,000. R.I.G.L. § 9–31–4.

dure.[21] They say nothing about jury trials, nor do they limit the issues that may be considered by the court. The only respect in which the State of Rhode Island now differs from the ordinary tort defendant is that its liability is limited to $50,000. *See* R.I.G.L. § 9–31–2.

Section 9–31–1 obviously represents a radical shift in state policy. Unfortunately, Rhode Island maintains no legislative history for its enactments. Thus, it is impossible to determine conclusively why the General Assembly chose to go beyond the municipal immunity issues raised in *Becker*, or how far it intended the state's consent to extend.[22] In searching for the import of § 9–31–1, this Court can be guided only by the language of the statute and by the context in which it was enacted.

On its face, § 9–31–1 is a blanket waiver of immunity; nothing in its language indicates that consent is restricted to appearances in Rhode Island courts. And, as noted above, there is nothing in the statutory context that points to such a restriction. There are no procedural directions that could be met only by Rhode Island courts. The parties have not produced, nor has this

Court independently found, other Rhode Island statutes that explicitly authorize federal court suits. This is not a case, then, where express waiver in one setting argues against finding implied waiver in another setting. Finally, there appears to be no relevant Rhode Island constitutional provision.[23] All these factors distinguish § 9–31–1 from the consent–to–suit statutes considered by many other federal courts. *See* notes 17–20 *supra.* Looking to the legal context in which § 9–31–1 was enacted, this Court's impressions as to the breadth of the Rhode Island statute are further strengthened. When the General Assembly chose to relinquish the State's immunity from suit, it did so in language that was extraordinarily liberal in comparison to then–existing law in most states. Undertaking an exhaustive comparative analysis of the state of sovereign immunity laws across the nation in 1970 is beyond the needs of this opinion and the patience of this Court. What follows is merely a summary of the salient points:

–Insofar as the Court can determine, in 1970, 27 states had no statutory provision mitigating the common law doctrine of sovereign tort immunity.[24] In at least

---

21. The only provisions that could be characterized as procedural are § 9–31–6, which directs the State Attorney General or his assistant to represent the State and authorizes him to settle any litigated claim with the approval of the court, and § 9–31–7, which designates the Attorney General as the State's agent for service of process. Neither of these are inconsistent with bringing an action in federal court.

22. The First Circuit Court has recently remarked on the difficulty of "divining the legislative intent of a legislative body that keeps no record of floor debate." *Rhode Island Federation of Teachers v. Norberg*, 630 F.2d 855, at 863 (1980).

Considering the marked change that § 9–31 1 worked in Rhode Island's legal policy, one is tempted to conclude that the General Assembly had come to agree with Justice Frankfurter that governmental immunity "is an anachronistic survival of monarchical privilege, and runs counter to democratic notions of the moral responsibility of the State." *Kennecott Copper Corp. v. State Tax Commission*, 327 U.S. 573, 580, 66 S.Ct. 745, 748, 90 L.Ed. 862 (1946) (Frankfurter, J., dissenting).

23. With the possible exception of Art. 1 § 5: REMEDIES FOR WRONGS RIGHT TO JUSTICE–Every person within this state ought to

find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character. He ought to obtain right and justice freely and without purchase, completely and without denial; promptly and without delay; conformably to the law.

24. *Alabama* "Alabama shall never be made a defendant in any court of law or equity." Ala.Const. Art. 1 § 14. *See Hutchinson v. Board of Trustees of University of Alabama*, 288 Ala. 20, 256 So.2d 281 (1971).

*Arkansas* "The State shall never be made a defendant in any of her courts." Ark.Const. Art. 5 § 20. *See State Highway Commissioner v. Lasley*, 239 Ark. 538, 390 S.W.2d 443.

*Colorado* In two 1971 cases, the Colorado Supreme Court abolished sovereign and governmental immunities, effective July 1, 1972. *See Proffitt v. State*, 174 Colo. 113, 482 P.2d 965 (1971); *Evans v. Board of County Commissioners*, 174 Colo. 97, 482 P.2d 968 (1971). The legislature promptly reinstated much of the doctrines by statute. *See* Col.Rev.Stat. §§ 24–10–101 to -117.

*Delaware* Del.Const. Art. 1 § 9 empowers legislature to adopt regulations for suing the state. This is an absolute bar to suit unless immunity is specifically waived. *Wilmington*

one of these states, the state court had held that this immunity did not extend to

*Housing Authority v. Williamson*, 228 A.2d 782 (Del.1967). This Court could find no such waiver for tort liability.

*Florida* –Tort Claims Act, Fla.Stat. §§ 768.-28–.31, effective July 1, 1974 and Jan. 1, 1975; covers negligent acts or omissions within scope of employment; no punitive damages or prejudgment interest permitted; claim must first be submitted to Dept. of Insurance or appropriate local agency; attorney's fee limited to 25%.

*Georgia* –Ga.Code Ann. § 89–932, enacted 1972, directs purchase of insurance policy for state employees driving state vehicles; no waiver of state's sovereign immunity. *See Hicks v. Shea*, 149 Ga.App. 396, 254 S.E.2d 511 (1979).

*Idaho* ·Tort Claims Act, Idaho Code §§ 6–901 to 928, enacted 1971; covers negligent torts only; requirement that claims first be filed with Secretary of State within 120 days of discovery; on denial of claim, jurisdiction in state district court; Idaho Rules of procedure; venue restrictions; no punitive damages.

*Indiana* Ind.Code Ann. §§ 17-2-1-1 to 4 (Burns) provided limited waiver of county's tort immunity; claims must first be submitted to county commissioner; appeal to state circuit or superior court.
Tort Claims Act, Ind.Code Ann. §§ 34-4-16.-5 1 to .18 (Burns), effective Feb. 1974; requirement that claims first be submitted to agency involved; § 34-4-16.7-1 to -3, added 1976, provides for state reimbursement of employees for § 1983 liability but expressly denies Eleventh Amendment waiver.

*Kansas* - Tort Claims Act, Kan.Stat.Ann. §§ 75 6101 to 6116, enacted 1979; covers negligent and wrongful acts and omissions with several exceptions; Kansas rules of procedure apply. Prior to this, § 75–418 provided procedures for serving process on state, but did not waive sovereign immunity.

*Louisiana* ·La.Rev.Stat.Ann. §§ 13:5103 to 5105 provided procedures for conducting suits authorized by the legislature to be filed against state, but did not waive state's immunity. 1974 Constitutional Amendment, Art. 12 § 10, abolished sovereign immunity in contract and tort. Tort Claims Act, La.Rev.Stat. Ann. §§ 13:5101 to 5111, enacted 1975; covered all suits in contract and for personal or property damage; venue restrictions; exclusive jurisdiction in state courts.

*Maine* –Tort Claims Act, Me.Rev.Stat.Ann. tit. 14 § 8101–18, effective Jan. 1977; immunity the rule, with exceptions for negligence in certain listed activities; original jurisdiction in state superior court; no Eleventh Amendment waiver; requirement that claims first be filed with agency involved within 180 days of incident.

*Maryland* –Md.Ann.Code art. 41 § 10A(a), art. 23A § 1A(a), art. 25 § 1A(a), art. 25A § 1A(a), art. 25B § 13A(a), enacted 1976; waives sovereign immunity in contract. Apparently still no waiver in tort.

*Massachusetts* –Mass.Gen.Laws Ann. ch. 258 § 1–4A, giving superior court jurisdiction of all claims in law or equity, construed not to include tort claims, except limited consent for injuries at Logan Airport. *See Benjamin Foster Co. v. Commonwealth*, 318 Mass. 190, 61 N.E.2d 147 (1945); *Glickman v. Commonwealth*, 244 Mass. 148, 138 N.E. 252 (1923). Tort Claims Act, Mass.Gen.Laws Ann. ch. 258 §§ 1–13, enacted 1978, covers negligent torts only; exclusive jurisdiction in superior court; venue directions; claim must first be filed with appropriate executive officer.

*Minnesota* ·Minn.Stat.Ann. § 3.732, enacted 1971, provided procedures for settling claims up to $2500 by state department and agency heads. As of 1975, sovereign tort immunity was still existent, *see Nieting v. Blondell*, 306 Minn. 122, 235 N.W.2d 597 (1975), but did not apply to proprietary activities, *see Susla v. State*, 311 Minn. 166, 247 N.W.2d 907 (1975).
Tort Claims Act, Minn.Stat.Ann. § 3.736, effective August, 1976; covers wrongful acts and omissions within scope of employment, with certain exceptions; must be in accordance with statutory procedures and in state court; no punitive damages; requirement that claim first be submitted to agency involved within 180 days.

*Mississippi* · Miss.Code Ann. § 11–45–1, providing that state can be sued in any court "at the seat of government" is not a waiver of sovereign immunity. *See Hall v. State,* 79 Miss. 38, 29 So. 994 (1901).

*Missouri* –Mo.Ann.Stat. § 537.600 (Vernon), enacted 1978, reaffirmed general sovereign and governmental tort immunities; waived immunity in limited areas of negligent operation of official motor vehicles and dangerous conditions of public entity property.

*New Hampshire* - Sovereign immunity in tort apparently still exists. N.H.Rev.Stat.Ann. §§ 507-B:1 to B:8, enacted 1975, is a limited abrogation of governmental tort immunity of counties and municipalities.

*New Mexico* ·The New Mexico Supreme Court abolished sovereign immunity in 1975. *See Hicks v. State*, 88 N.M. 588, 544 P.2d 1153. Tort Claims Act, N.M.Stat.Ann. §§ 41–4–1 to ·25, enacted 1976, reestablished immunity except as explicitly waived in statute; no liability for "malicious or fraudulent torts"; exclusive jurisdiction in N.M. state courts; venue directions; requirement that claims first be presented to agency involved.

torts committed in the course of purely proprietary functions, but as a practical

matter this was a fairly limited category.[25] In three states, *any* waiver of immunity was expressly forbidden by the state constitution.[26] Several of the 27 had consented to answer in some fashion to contract claims.[27]

*North Dakota* –Sovereign immunity in tort apparently still exists. N.D.Cent.Code §§ 32-12.1 to .15, enacted 1977, sets out procedures for suing counties, etc., in response to the North Dakota Supreme Court's abolition of governmental immunity in *Kitto v. Minot Park District*, 224 N.W.2d 795; statute expressly preserves sovereign immunity. *See* § 32 -12.1 -03(4).

*Ohio* -Court of Claims Act, Ohio Rev.Code Ann. §§ 2743.01 to .20, effective January, 1975; blanket waiver of state's immunity; exclusive jurisdiction in court of claims with prescribed procedures.

*Pennsylvania* In 1978, the Pennsylvania Supreme Court abolished sovereign immunity in *Mayle v. Commonwealth*, 479 Pa. 384, 388 A.2d 709. The legislature promptly reestablished full tort immunity in September, 1978. *See* P.L. 788 No. 152 § 1', codified at 1 Pa.C.S.A. § 2310.

*South Dakota* S.D.Const. Art. III § 27 authorizes legislature to direct in what manner and courts state could be sued. This Court could find no statutory waiver for tort liability.

*Tennessee* –Tenn.Code Ann. § 20–1702 assures preservation of sovereign immunity by taking all jurisdiction from the courts to hear claims against state. § 23–3601, enacted 1977, waives state's immunity in express contract claims; jurisdiction limited to courts of Davidson county; no jury.

*Virginia* -Va.Code §§ 2.1–223.1 to 223.6 and 8.01 -192 -95, providing procedures for claims against the state, do not waive sovereign tort immunity. *See Elizabeth River Tunnel District v. Beecher*, 202 Va. 452, 117 S.E.2d 685 (1961).

*West Virginia* -"The State shall never be made a defendant in any court of law or equity." W.Va.Const. Art. 6 § 35. The legislature cannot waive this immunity. *See Boggs v. Board of Education*, W.Va., 244 S.E.2d 799 (1978).
The legislature has attempted to get around this constitutional ban by creating a court of claims to consider contract and tort claims, with certain exclusions, which the state "in equity and good conscience should discharge." W.Va.Code §§ 14–2–1 to –29. This court will apparently recommend an action to the legislature, who decides whether to appropriate funds.

*Wisconsin* -Wis.Stat.Ann. § 285.01 to .06, providing that claimant can sue in state court upon legislative refusal to allow claim against the state, does not apply to tort

–One state, Montana, had taken an equivocal position on immunity. It permitted its courts to render tort judgments against the state if, and only to the extent that, the state had liability insurance covering the incident.[28]

claims. *See Chart v. Gutmann*, 44 Wis.2d 421, 171 N.W.2d 331 (1969); *Townsend v. Wisconsin Desert Horse Ass'n*, 42 Wis.2d 414, 167 N.W.2d 425 (1969).
§§ 895.43 to .45 abrogate governmental tort immunity of counties and municipalities but do not waive sovereign immunity. *See Townsend, supra.*

*Wyoming* –Wyo.Stat. § 1 35 101, providing that all actions against state must be brought in Wyoming state courts, is apparently only procedural. Section 1 35 102, enacted 1975, waives immunity only to the extent of insurance coverage.
In 1978, the Wyoming Supreme Court abrogated the governmental immunity of counties and municipalities, expressly reserving the question of sovereign immunity. *See Oroz v. Board of County Commissioners*, 575 P.2d 1155. The Government Claims Act, enacted 1979, preserves sovereign immunity except in many negligence cases; claims must first be submitted to state auditor; jurisdiction in Wyoming district court; venue directions.

The Court was not able to ascertain the state of the law in Oklahoma in 1970.

**25.** *Indiana* -*Perkins v. State*, 252 Ind. 549, 251 N.E.2d 30 (1969).

**26.** *See* Alabama, Arkansas, and West Virginia, note 24, *supra.*
Louisiana had a constitutional provision forbidding state consent to federal court suit. *See* Const. of 1921 Art. 3 § 35 (amended 1974).

**27.** *E. g.:*
*Indiana* -Ind.Stat.Ann. § 34 4 16 -1 (Burns); jurisdiction limited to superior court of Marion County; no jury; Indiana rules of procedure.
*Massachusetts* –*See* note 24 *supra.*
*North Dakota* -N.D.Cent.Code § 32–12–02; also includes claims regarding title to property; requirement that claims be first submitted to agency involved; venue directions.
*Pennsylvania* -72 Pa.Cons.Stat. §§ 4651–1 to 10; sets up exclusive Board of Arbitration procedure.
*Virginia* -*See* note 24 *supra.*
*Wisconsin* -*See* note 24 *supra.*
*See also* West Virginia, note 24 *supra.*

**28.** Mont.Rev.Codes Ann. § 83 -701 to –707, repealed in 1977.

—Two states were in transition during this period. In New Jersey, the state Supreme Court abolished sovereign immunity in a 1970 case. The legislature, as a stopgap measure, enacted a statute reestablishing immunity until it could study the situation. In July, 1972, the New Jersey Tort Claims Act became effective. The Act provided for a waiver of immunity in specified cases and clearly contemplated that suit would be brought in state courts.[29] Illinois was moving from a constitutional prohibition of any waiver to a new constitutional and statutory policy of permitting all types of claims against the state. The conduct of such suits was carefully controlled, however, through the establishment of a special Court of Claims system, which was the exclusive means of proceeding against the state.[30]

—By the end of 1970, 18 states had waived by statute at least a part of their sovereign immunity in tort. Of these, 10 accepted liability only for negligent torts,[31] and, even in the area of negligence, there were often exceptions for discretionary activities, issuance of licenses and permits, conduct of inspections, and/or assessment of taxes. One of the 10, South Carolina, had waived immunity only in the area of negligent operation of motor vehicles by state employees. The other 8 states accepted varying degrees of liability for intentional as well as negligent torts.[32] At the one extreme, New York

29. Judicial abrogation of New Jersey's immunity came in *Willis v. Department of Conservation and Economic Development*, 55 N.J. 534, 264 A.2d 34 (1970). The legislature reacted by passing N.J.Rev.Stat. § 52:4A–1 as interim legislation. The New Jersey Tort Claims Act, N.J. Rev.Stat. §§ 59:1 -1 to 14-4, effective July, 1972, requires presentation of claim to agency involved; N.J. rules of procedure control; no prejudgment interest or punitive damages are allowed; no jury trial in original version (amended 1975).

30. Const. of 1870, Art. IV § 26: "Illinois shall never be made a defendant in any court of law or equity."
Const. of 1970, Art. 13 § 4: "Except as the General Assembly may provide by law, sovereign immunity is abolished." This became effective January 1, 1972.
Ill.Rev.Stat. ch. 37 §§ 439.1 to .25 is the Court of Claims Act. Ill.Rev.Stat. ch. 127 § 801 provides that, except as set out in the Court of Claims Act, the state has full immunity in any court.

31. *Alaska* - Alaska Stat. § 09.50.250, enacted 1965; jurisdiction in state superior court.
*Arizona* Ariz.Rev.Stat.Ann. § 12–821, enacted 1912; claim must first be disallowed by proper state administrative officer; plaintiff must post bond; venue change at Attorney General's request; no costs against state.
*Iowa* -Iowa Code §§ 25 A.1 to .22, enacted 1965; claim must first go to state appeals board, then into Iowa state court system; no jury. Iowa rules of procedure; no prejudgment interest or punitive damages; this procedure is exclusive.
*Kentucky* –Ky.Rev.Stat. §§ 44.070–.160, enacted 1946; established Board of Claims to deal with negligence claims; exclusive jurisdiction; on the record factfinding and written decision; review by county circuit court; Ky. rules of procedure; no jury.
*Nebraska*–Neb.Rev.Stat. §§ 81–8.209 to .239, enacted 1969; claim must first go to state claims board, then into Nebraska court system; no jury; venue directions; Nebraska rules of procedure.
*North Carolina* -N.C.Gen.Stat. §§ 143 291 to 300.1, enacted 1951; established "Industrial Commission" to hear negligence claims; damages limited to $30,000 (amended 1977); after appeal to full Commission is exhausted, limited review in N.C. Court of Appeals; Commission findings of fact are conclusive.
*South Carolina* -S.C.Code §§ 15 77 -210 to 250, enacted 1962 68; waives immunity for negligent operation of motor vehicles within scope of employment; claim must be made within 3 months.
*Texas* - Tex.Rev.Stat.Ann. Art. 6252–19, enacted 1969; venue limits; Texas rules of procedure apply.
*Utah* –Utah Code Ann. §§ 63 -30–1 to -34, enacted 1965; lists governmental activities for which immunity is waived; requires that claims first be submitted to agency involved; exclusive jurisdiction in Utah courts; Utah rules of procedure; venue directions; no punitive damages.
*Vermont* -Vt.Stat.Ann. tit. 12 §§ 5601 to 5605, enacted 1961; no waiver for discretionary acts; exclusive jurisdiction in county courts.

32. *California* –Cal. Government Code tit. 1 Div. 3.6 pts. 3 & 4 (West), enacted 1963; detailed explication of bases of liability; exemptions for nuisance, discretionary acts, conduct of inspections; requires that all claims first be made to agency involved or comptroller, and rejected; venue directions.
*Connecticut* –Conn.Gen.Stat. §§ 4–141 to 165, enacted 1959; Commission on Claims has

and Washington consented to full substantive liability with virtually no exceptions; at the other extreme, Michigan limited its consent, with very few exceptions, to proprietary activities.

—Fifteen of these 18 states attached some significant procedural condition to their consent. Six states expressly limited such suits to certain state courts;[33] one state, although not explicitly mentioning its own courts, implied that suits should be brought there by giving directions for the laying of venue and the use of state procedural rules.[34] Three others provided venue instructions and required that claims first be filed with certain state officials or agencies.[35] Five states established special courts of claims or administrative boards to handle these cases.[36] In addition, many of the statutes contained provisions for assessment of costs, punitive damages and prejudgment interest,[37] and for the use of a jury.[38]

—Only three of the 18 did not, by such procedural restrictions, manifest an intention that suits against the state be brought in the state's own courts. Both South Carolina, which limited its liability to negligent torts, and Oregon, which accepted negligent and intentional tort liability, did require as a condition precedent to suit that claims be submitted to the agency involved within a relatively short time. Nevada, which accepted liability for most torts, had no procedural requirements at all until 1973, when it amended its statute to vest exclusive jurisdiction over such claims in its own courts.[39]

Thus, the Rhode Island Tort Claims Act is remarkable for both its substantive breadth and its procedural simplicity. While other states were clinging fast to their tort immunity, or giving a consent to suit that was hedged with exceptions and conditions, Rhode Island enacted legislation that was

exclusive jurisdiction; on the record factfinding and written decision; Commission reports results to legislature or may authorize claimant to sue; in latter case, venue restrictions, no jury, Connecticut rules of procedure; no other review of Commission's actions.

*Hawaii* –Hawaii Rev.Stat. §§ 662–1 to –15, enacted 1957; no punitive damages or prejudgment interest; exclusive jurisdiction in circuit court; no jury; Hawaii rules of procedure.

*Michigan* –Mich.Stat.Ann. §§ 3.996(107) to (113), [691.1407 to 691.1413], 27A.6419, [600.6419], enacted 1970 and 1939 respectively; immunity preserved for governmental activities with very limited exceptions, *see* Thomas v. Department of State Highways, 398 Mich. 1, 9 n.3, 247 N.W.2d 530 (1976); exclusive jurisdiction in court of claims.

*Nevada* –Nev.Rev.Stat. §§ 41.0305 to .039, enacted 1965; broad waiver subject to certain exceptions; amended 1973 to give exclusive jurisdiction to Nevada courts and in 1977 to deny Eleventh Amendment waiver.

*New York* –N.Y. Judiciary Laws § 8–12, enacted 1920–36; state waives all immunity; exclusive jurisdiction in court of claims; strict procedural requirements.

*Oregon* –Or.Rev.Stat. §§ 30.260 to .300, enacted 1968; complete liability regardless of governmental or proprietary nature of activity, with certain exceptions; "tort" includes § 1983 violations; requirement that claim first be presented to agency involved within 180 days.

*Washington* –Wash.Rev.Code §§ 4.92.020 to .170, enacted 1961 & 1963; blanket waiver; venue restrictions; requirement that claim first be presented to Director of Financial Management.

**33.** *See* Alaska, Hawaii, Iowa, Nebraska, Utah, Vermont, notes 31–32 *supra.*

**34.** *See* Texas, note 31 *supra.*
Connecticut, Hawaii, Iowa, Kentucky, Nebraska and Utah also direct that state procedural rules be used. *See* notes 31- 32 *supra.*

**35.** *See* Arizona, California and Washington, notes 31–32 *supra.*
Venue instructions were fairly common, *see* Connecticut, Nebraska, Texas, Utah, notes 31–32 *supra,* as was the requirement of prompt presentation of the claim to the agency or official involved before institution of suit. *See* Iowa, Nebraska, Oregon, South Carolina, Utah, notes 31–32 *supra.*

**36.** *See* Connecticut, Kentucky, New York, North Carolina, Michigan, notes 31–32 *supra.*

**37.** *See, e. g.,* Arizona, Hawaii, Iowa, Utah, notes 31–32 *supra.*

**38.** *See, e. g.,* Connecticut, Hawaii, Iowa, Kentucky, Nebraska, notes 31–32 *supra.*

**39.** The statutes of these three states are outlined in notes 31–32 *supra.*

straightforward, uncomplicated, and unreserved.

■ In light of all these considerations, this Court in 1975 held that § 9–31–1 does represent a waiver of the State's Eleventh Amendment immunity for tort suits in the federal court. *See Bowen v. Evanuk*, C.A. No. 5009 (D.R.I. July 11, 1975) (unreported opinion). *Accord Federal Express Corp. v. Rhode Island*, C.A. No. 76–434 (D.R.I. May 18, 1977) (unreported opinion). That prior holding is not, of course, dispositive here, for a waiver of Eleventh Amendment immunity in tort actions would not necessarily comprehend a similar waiver in § 1983 actions. The fact that this Court has already construed § 9–31–1 to include a waiver of some of the State's constitutional immunity has a certain degree of significance, however. In the five years since *Bowen v. Evanuk*, the General Assembly has not voiced disagreement with that case by amending the statute. While this Court is well aware of the perils of attaching too much meaning to legislative inaction, the General Assembly's apparent acquiescence is some confirmation of the conclusion, independently reached by this Court, that the State's consent to suit is not limited to its own courts.[40]

Once it is established that § 9–31–1 manifests a waiver of Eleventh Amendment immunity in tort actions, the question remains whether this waiver extends to actions under § 1983. The parallels between § 1983 and the common law of torts have been long recognized by courts and commentators. The Supreme Court has often referred to conduct actionable under § 1983 as "constitutional torts." *See Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Monell v. New York Dept. of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The First Circuit, in holding that the state statute of limitations for tort actions is the appropriate measure of limitations in § 1983 suits, has noted that just as state tort law vindicates social policies embedded in the common law, so § 1983 vindicates social policies expressed in the Constitution. *See Walden III, Inc. v. State of Rhode Island*, 576 F.2d 945 (1st Cir. 1978); *Graffals Gonzalez v. Garcia Santiago*, 550 F.2d 687 (1st Cir. 1977). In *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), an undivided Court sanctioned use of the tort model in § 1983 actions:

> The legislative history of § 1983 ... demonstrates that it was intended to "[create] a species of tort liability" in favor of persons who are deprived of constitutional "rights, privileges, or immunities secured" to them by the Constitution.
> *Id.* at 253, 98 S.Ct. at 1047 (citations omitted).

In holding that federal courts should look to state tort law as the measure of damages in many § 1983 actions, the Court stated:

> [O]ver the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights. These rules, defining the elements of damages and the prerequisites of their recovery, provide the appropriate starting point for the inquiry under § 1983 as well.
> *Id.* at 257–58, 98 S.Ct. at 1049 (citations omitted).

■ Thus, the close relationship between tort law and § 1983 is clear.[41] The two are

---

**40.** In *Santanelli v. City of Providence*, the Rhode Island Supreme Court, confronted with the argument that one of its prior holdings should be overruled because the Court had not correctly interpreted the legislature's intent, responded:

> Were [appellants] correct in that judgment, the legislature, which has several times met since that decision was announced, would in all probability have corrected what [appellants] suggest was our error by amending the

law so as to leave no doubt that it had intended that the general legislation would prevail over the special enactment. In the absence of any action on its part, however, it is not presumptive for us to assume that [our prior holding] met with general assembly approval.

105 R.I. 208, 212, 250 A.2d 849, 851 (1969).

**41.** For an excellent analysis of the interplay between the two, *see* Note, *Damage Awards for*

not, of course, identical. Some violations of tort law will not be cognizable under § 1983, *see, e. g., Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979); *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), while, on the other hand, § 1983 will reach certain conduct that may not be tortious at common law, *see, e. g., Dillon v. Pulaski County Special School District*, 468 F.Supp. 54 (E.D. Ark.1978), *aff'd per curiam*, 594 F.2d 699 (8th Cir. 1979) (refusal to allow expelled student to summon eyewitness); *Rheuark v. Shaw*, 477 F.Supp. 897 (N.D.Tex.1979) (denial of right to speedy appeal.) Nevertheless, there is a broad range of wrongful behavior that is actionable under both § 1983 and state tort law, and it is to that range of conduct that this Court's attention is now directed.

In § 9–31–1, the State of Rhode Island has clearly and unambiguously agreed to appear in court and answer for certain wrongful behavior as if it were a private person. In the considered judgment of the Rhode Island General Assembly, it was appropriate for the State finally to open its Treasury to compensate victims of official violations of social policy. Whether a plaintiff's legal theory is that a particular State action *tortiously* interfered with his or her person or property, or that that same State action *unconstitutionally* interfered with his or her person or property, the practical consequences to Rhode Island are the same. It will have to appear in court, put on a defense, and perhaps, pay up to $50,000 in compensatory and/or punitive damages.[42] Thus, once Rhode Island had decided to take the giant step of consenting to be liable for a certain range of official con-

duct, it would have been but a small step to accept liability when the conduct was labelled a "constitutional," rather than a "common law," tort.

■ Section 9–31–1 does not, of course, mention § 1983, and there is no extant record of what the General Assembly thought or said at its passage. The answer to whether Rhode Island did take that additional small step must, therefore, be based on circumstantial evidence. The statute was enacted in 1970. Although this was somewhat before the deluge of civil rights litigation, § 1983 had, by that time, been rediscovered as an effective tool for combatting official infringement of constitutional rights.[43] Nine years earlier, *Monroe v. Pape* had identified the "background of tort liability" as the framework through which § 1983 was to be viewed. It would have seemed fairly certain, after *Monroe*, that the states were not forced to accept § 1983 liability, but there would have been no apparent bar to consensual assumption of such liability. Passage of § 9–31–1 reflected a metamorphosis in Rhode Island's legal and political philosophy.[44] It established a new relationship between the State and the private citizen injured by official misconduct; it showed a responsibility and responsiveness that stood in marked contrast to the State's own policies in the past and to the contemporary attitudes of most of its sister states. This Court therefore concludes that Rhode Island, through the enactment of § 9–31–1, did consent to liability under § 1983, at least insofar as the challenged official conduct would have been tortious at common law.

*Constitutional Torts: A Reconsideration after Carey v. Piphus*, 93 Harv.L.Rev. 966 (1980).

**42.** This Court assumes, without deciding, that Rhode Island can validly limit its Eleventh Amendment waiver to damage assessments less than or equal to $50,000.

**43.** According to the *Annual Report of the Director*, published by the Administrative Office of the U.S. Courts, the number of suits filed nationwide under the civil rights statutes was 296 in 1961 and 5,138 in 1971 (1976 Report at 78). By 1978, the number had skyrocketed to

12,829 (1978 Report at 179). This does not include prisoner petitions and applications for the writ of habeas corpus. No separate figures for § 1983 suits are given in the Report, but even a cursory review of the Modern Federal Digest reveals numerous reported § 1983 actions prior to 1970.

**44.** One of the best indicators of this change in the legal climate is the Rhode Island Supreme Court's reevaluation of municipal immunity in *Becker v. Beaudoin*, 106 R.I. 562, 261 A.2d 896 (1970).

In reaching this conclusion, the Court is mindful of the dangers of too readily discerning a relinquishment of constitutional rights. It is also aware, however, that finding an implied waiver in § 9–31–1 contravenes none of the important policies underlying the Eleventh Amendment. The federal court will not be called upon to decide difficult and complex questions of state law. Nor will it be imposing on the State a massive and unexpected fiscal burden. By holding only that Rhode Island has consented to answer for § 1983 violations that involve traditionally tortious conduct, this Court does not expose the State to any liability which it has not unambiguously consented to undertake anyway. The Court merely takes Rhode Island at its word that it is ready to assume responsibility for a certain range of wrongful official behavior.

Today's decision does not conflict, in letter or spirit, with the Rhode Island Supreme Court's recent opinion in *Calhoun v. City of Providence*, R.I., 390 A.2d 350 (1978). In *Calhoun*, the Rhode Island Court held that § 9–31–1 did not abrogate the traditional official immunity accorded judicial activities. While admitting that § 9–31–1 did not expressly preserve official immunities, the Court pointed to "a decided reluctance in all jurisdictions that have considered the question to impose liability upon the state *for certain activities* conducted by its agents and servants." *Id.* at 354 (emphasis added). In holding that judicial—and, by implication, prosecutorial and legislative–immunity survives in § 9–31–1, the Court concluded that "*certain governmental enterprises* engaged in by employees and officers must be free from the threat of potential litigation" in order for government to function effectively. *Id.* at 355 (emphasis added). Today's holding is not antagonistic to these concerns. Throughout its opinion, the Rhode Island Supreme Court speaks of the need to immunize particular *types* of official behavior, specifically, inherently judicial activities. The fact that certain, traditionally protected kinds of governmental activity are outside the ambit of § 9–31–1 does not affect the scope of the State's consent to liability for those kinds of activity admit-

tedly within the sweep of the statute. Moreover, the judicial conduct involved in *Calhoun* would have been privileged under § 1983 as well. *See Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). *Cf. Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (prosecutorial immunity under § 1983); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (legislative immunity under § 1983).

 In this case, the plaintiff has alleged that Rhode Island State police officers in the course of an official investigation applied to his skin a substance which they knew or should have known to be harmful and dangerous. He claims that this application was unlawful and, reading the complaint liberally, without his consent. Although there seems to be no Rhode Island case on point, this conduct, if proved, would appear to be tortious at common law. *See* W. Prosser, *The Law of Torts* 34–37, 49–62 (4th ed. 1971). *Cf. Wilkinson v. Vesey*, 110 R.I. 606, 295 A.2d 676 (1972). As plaintiff has alleged that the defendants acted pursuant to an official custom and policy of the Rhode Island State Police Force, the complaint states a cause of action under § 1983 against the State itself. *Cf. Monell v. New York Department of Social Services*, 436 U.S. at 694–95, 98 S.Ct. at 2037–2038.

The defendant State of Rhode Island's motion to dismiss is accordingly denied.

## MOTION TO DISMISS OF DEFENDANTS OTHER THAN THE STATE OF RHODE ISLAND

 All of the other defendants move to dismiss, claiming that Marrapese's suit is barred by the statute of limitations. All parties agree that the relevant limitations period is three years, for R.I.G.L. § 9–1–14 applies to § 1983 actions. *Walden III, Inc. v. Rhode Island*, 576 F.2d 945 (1st Cir. 1978). The action here complained of–application of the chemical benzidine to plaintiff's skin–occurred on March 19, 1975; this suit was filed in April, 1980. The plaintiff claims, however, that his cause of action did not accrue until he learned that he had been

injured, and that he did not learn of the allegedly carcinogenic properties of benzidine until sometime in 1980.

The federal courts who have considered the question seem to agree that the "discovery rule" applies in § 1983 cases. Under this standard, a cause of action accrues "when plaintiff knows or has reason to know of the injury which is the basis of the action." *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975). Alternatively, the point of discovery has been defined as the time "when the plaintiff is, or should be, aware of both the injury and its connection with the acts of the defendant." *Lavellee v. Listi*, 611 F.2d 1129, 1131 (5th Cir. 1980). *See Mitchell v. Hendricks*, 431 F.Supp. 1295, 1298–99 (E.D.Pa.1977). Thus, if federal law indeed governs accrual of his cause of action, plaintiff is correct that his action could be timely.

The Supreme Court has recently held that reference to the state statute of limitations in § 1983 actions must include use of the state tolling rules. *Board of Regents v. Tomanio*, 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). This decision was not surprising in light of *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 462–64, 95 S.Ct. 1716, 1721–22, 44 L.Ed.2d 295 (1974), in which the Court rejected the suggestion that tolling of the limitations period in a § 1981 action was governed by federal law. Writing for the *Johnson* Court, Justice Blackmun reasoned:

> Any period of limitation ... is understood fully only in the context of the various circumstances that suspend it from running against a particular cause of action. Although any statute of limitations is necessarily arbitrary, the length of the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones. In virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling, revival, and questions of application. In borrowing a state period of limitation for application to a federal

cause of action, a federal court is relying on the State's wisdom in setting a limit, and exceptions thereto, on the prosecution of a closely analogous claim.

*Id.* at 463–64, 95 S.Ct. at 1722.

The reasoning in *Johnson* was broad enough to encompass the related issue of accrual, even though the question of when a cause of action arises is analytically distinct from the question of what tolls the statute of limitations. Nevertheless, several circuit courts since *Johnson* have had little hesitation in asserting that federal common law determines when a cause of action accrues despite use of a state limitations period. *See, e. g., Lavellee v. Listi*, 611 F.2d at 1131; *Briley v. California*, 564 F.2d 849 (9th Cir. 1977); *Martin v. Merola*, 532 F.2d 191, 195 n. 7 (2d Cir. 1976); *Cox v. Stanton*, 529 F.2d at 50. It must be conceded that these cases contain no discussion of why state law should govern tolling but not accrual.

■ The Court in *Tomanio* quoted the above language from *Johnson*, and Justice Rehnquist's opinion seems to espouse a broad view of the degree to which state limitations law is to be incorporated into § 1983 adjudication. Thus, despite post–*Johnson* circuit court decisions, it may not be appropriate, after *Tomanio*, to employ federal rules of accrual in conjunction with the state statute of limitations. This Court need not decide, however, whether the questions of when the statute of limitations begins to run and when it is tolled are sufficiently different to justify applying federal law to the former and state law to the latter. Although the issue is not free from doubt, the Court believes that Rhode Island would employ the discovery rule in this case. Thus, whether federal or state accrual law applies, it does not appear–at least at this stage in the litigation–that the action is time–barred.

In *Wilkinson v. Harrington*, 104 R.I. 224, 243 A.2d 745 (1968), the Rhode Island Supreme Court undertook a thorough analysis of the development and purposes of statutes of limitations and determined that adoption of the discovery rule in medical malpractice cases was "compatible with the statute of

repose" and conducive to fair resolution of claims. It said, "It would, in our opinion, be manifestly unjust to bar the enforcement of injury claims brought by a plaintiff who was not, or could not have known that he was, the victim of tortious conduct because the consequent harm was unknowable within two years of the negligent act." *Id.* at 237, 243 A.2d at 752 (action under old, two–year statute, amended effective Aug. 1, 1971). This Court has not found, or been directed to, a case in which the Rhode Island Supreme Court has directly addressed the applicability of the discovery rule to other types of personal injury actions. *Cf. Von Villas v. Williams,* 117 R.I. 309, 314–15, 366 A.2d 545, 549 (1976); *Romano v. Western Electric Co.,* 114 R.I. 451, 460–61, 336 A.2d 555, 559–60 (1975); *Hardy v. Zoning Board of Coventry,* 113 R.I. 375, 379, 321 A.2d 289, 291 (1974). *Compare Fuscellaro v. Industrial National Corp.,* 117 R.I. 558, 563, 368 A.2d 1227, 1231 (1977) (rejecting discovery rule in action for conversion of check; court emphasized importance of finality to free negotiability). The Court believes, however, that the rationale of *Wilkinson* applies equally to the instant case, so that, under Rhode Island law, plaintiff's cause of action arose at the time he actually, or reasonably should have, discovered benzidine's carcinogenic properties.

The Supreme Court in *Tomanio* reaffirmed the rule that federal courts may disregard an otherwise applicable state law if the law is "inconsistent with the federal policy underlying the cause of action under consideration." 446 U.S. at 485, 100 S.Ct. at 1795, *quoting Johnson v. Railway Express Agency, Inc.,* 421 U.S. at 465, 95 S.Ct. at 1722. This Court believes that if Rhode Island would *not* apply the discovery rule to the facts of the present case, then application of the state rule would be fundamentally inconsistent with the policies of § 1983. Those policies, compensation of the victim of unconstitutional action and deterrence of the perpetrator, are not impermissibly jeopardized simply because application of the state rule defeats a particular plaintiff's claim. *Robertson v. Wegmann,* 436 U.S. 584, 593, 98 S.Ct. 1991, 1996–97, 56 L.Ed.2d

554 (1978). In *Tomanio,* for example, the Court condoned use of the state tolling law, despite its fatal consequences for the plaintiff, after noting that "plaintiffs can still readily enforce their claims, thereby recovering compensation and fostering deterrence, simply by commencing their actions within three years." 446 U.S. at 488, 100 S.Ct. at 1797. If, however, the discovery rule were not employed, a certain class of § 1983 plaintiffs would never be able to enforce their claims. In cases of latent injury, the limitations period could run before even the most diligent person realized that he had been wronged, and the salutory goals of compensation and deterrence would be completely frustrated.

Therefore, if *Tomanio* does require that Rhode Island accrual rules be consulted in this § 1983 action, this Court finds that Rhode Island would employ the discovery rule here. In addition, the Court finds that the discovery rule is necessary to fulfill the goals of § 1983 in latent injury cases, so that a Rhode Island rule to the contrary would be rejected as inconsistent with the federal policy underlying this cause of action.

Defendants have not controverted plaintiff's allegation that he discovered the carcinogenic properties of benzidine within a reasonable time. Therefore, it is hereby ordered that the motions to dismiss of defendants other than the State of Rhode Island be denied, without prejudice to further argument regarding the reasonableness of plaintiff's late knowledge.