## Wareham v. Jeffes

*A. Roy DeCaro* and *Harry M. Roth,* for plaintiff. *Ronald Yen,* for defendants.

GOLDMAN, *J.,* September 9, 1987— On August 25, 1980, Joseph Wareham, plaintiff, was incarcerated at the State Correctional Institute at Dallas (SCID) where he was stabbed at the base of the neck and slashed about the arms and chest by one or more inmates. Mr. Wareham was proceeding down a stairway leading to the exercise yard when the stabbing occurred. Plaintiff was admitted to Nesbitt Hospital, Kingston, Pa., for surgical treatment of the stab wound. The homemade weapon used by Wareham's assailant lacerated the left side of the spinal cord and caused temporary paralysis of his lower extremities. Mr. Wareham's permanent injuries consist of weakness and spasticity of the left lower leg, decreased sensation on both sides of his body, and ptosis or drooping of the right eyelid.

At Nesbit Hospital, Wareham received physical therapy for his neurologic deficits. On September 11, 1980, he was discharged from Nesbitt and transported to the State Correctional Institute at Pittsburgh (SCIP), where he is presently incarcerated. All parties agree that plaintiff received some physical therapy and medical treatment at SCIP, but dispute whether that treatment was negligent and/or violated plaintiff's constitutional rights.

Plaintiff brought this action against present and former prison officials, the commonwealth of Pennsylvania, and the Bureau of Corrections. The main issues before the jury were (1) whether the administration at SCID knew or should have known of alleged threats to Mr. Wareham's safety prior to the stabbing incident and failed to take adequate measures to protect him; and (2) whether the administration at SCIP failed to provide plaintiff with adequate medical or therapeutic treatment.

## PROCEDURAL HISTORY

Plaintiff initially grounded his claims on both common law negligence theories and violations of his federal civil rights under the Fifth, Eighth, and 14th Amendments, and 42 U.S.C. §1983.

After defendants' motions for summary judgment were granted in part and plaintiff withdrew other claims, the only issues remaining to be tried were: (1) section 1983 liability against individual defendants Larkins, Walters, Gabriel and Stepanik for alleged inadequate protection; (2) section 1983 and negligence claims against defendant Morrash for alleged inadequate medical treatment; and (3) vicarious liability against the bureau and the commonwealth under the doctrine of respondeat superior for

defendant Morrash's alleged negligence.[1] The jury found, via special interrogatories, that plaintiff's constitutional rights had not been violated under any of the theories and awarded damages of $260,000 to plaintiff against defendant Morrash on the inadequate medical treatment claim.

The commonwealth now seeks, alternatively, a new trial, judgment non obstante veredicto, or to have the verdict molded to reflect the statutory liability limit of $250,000 pursuant to 42 Pa.C.S., §8528. Plaintiff also seeks a new trial against defendants Larkins, Walters, Gabriel, Stepanik, commonwealth, and the bureau on the inadequate protection claims brought under 42 U.S.C. §1983, and judgment non obstante veredicto or a new trial against defendant Morrash on the section 1983 claim for inadequate medical treatment. Plaintiff also seeks delay damages.

## DEFENDANTS' POST-TRIAL MOTIONS

In support of their post-trial motions, defendants argue that:

(1) The trial court erred in refusing to grant summary judgment and a directed verdict in favor of the commonwealth, the bureau and defendant Morrash because negligence claims against these defendants are barred by the Sovereign Immunity Act.

(2) The trial court erred in failing to grant a directed verdict in favor of defendants because plaintiff failed to prove all of the elements of his prima facie negligence and civil rights claims for inadequate medical treatment.

---

1. This issue was not submitted to the jury since the commonwealth agreed that it would not contest the vicarious liability issue if defendant Morrash was found to be negligent.

·(3) The trial court erred in refusing to grant defendants' preliminary objections and petitions for change of venue.

(4) The trial court erred in refusing to permit defendants to present evidence of the particular crimes of which plaintiff had been convicted, as this evidence was relevant on the issue of loss of earning capacity.

(5) The trial court erred in permitting plaintiff to testify about his discharge from the hospital ward at SCIP; in overruling objections to testimony by defendant Morrash on the scope of his duties; and in overruling objections to cross-examination of defendant Morrash on the physical therapy given to plaintiff.

(6) The verdict was excessive.

(7) The verdict should be molded to conform to the statutory limitation on the recovery of damages stated in 42 Pa.C.S. §8528.

Defendants' averment that plaintiff failed to prove all of the elements of his prima facie negligence claim has merit and requires the grant of judgment n.o.v. As a preliminary matter, however, it is necessary to discuss defendants' contention that plaintiff's negligence claim is barred by sovereign immunity in order to reach the other arguments.

A. *The Court Did Not Err in Refusing To Grant Summary Judgment or a Directed Verdict in Favor of the Commonwealth Defendants Because Plaintiff's Negligence Claim for Inadequate Medical Care Is Not Barred by the Sovereign Immunity Act*

The gravamen of defendants' argument is that sovereign immunity has not been waived under the "medical-professional liability" exception of the Pennsylvania Sovereign Immunity Act—the only one of the eight exceptions to sovereign immunity

that would be at issue here. Defendants argue that the medical-professional liability exception waives immunity only for conduct that can be categorized as medical malpractice, not for "inadequate treatment as a result of decisions of state correctional administrators."

In support of this argument, defendants rely on Joseph Morrash's testimony at trial that the scope of his job description did not encompass the administration of medical treatment, that he has never made any medical-therapeutic decisions in the course of his employment as chief health care administrator for the infirmary at SCIP, and that he is not medically licensed as a health care provider.

The medical-professional liability exception of the act provides:

"(b) Acts which may impose liability.—The following acts by a commonwealth party may result in the imposition of liability on the commonwealth and the defense of sovereign immunity shall not be raised to claims for damages caused by . . .

"(2) Medical-professional liability. — Acts of health care employees for commonwealth agency medical facilities or institutions or by a commonwealth party who is a doctor, dentist, nurse or related health care personnel." 45 Pa.C.S. §8522 (Purdon 1982).

Defendants construe the language of the exception extremely narrowly arguing that defendant Morrash is not an employee of a "medical facility or institution" and making an implied argument that one must be clinically licensed or a direct health care provider in order to find liability for negligence under the act.

Section 8522, written in the disjunctive, creates two distinct categories of individual defendants who can be found liable: (1) health care employees of

medical facilities or institutions, and (2) doctors, dentists, nurses and related health care personnel. 45 Pa.C.S. §8522 supra. See *Commonwealth v. Bretz*, 289 Pa. Super. 259, 264, 433 A.2d 55, 58 (1981), ("or" is disjunctive particle meaning alternative of two propositions, not both).

In construing a statute the Legislature has provided that "technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa.C.S. §1903(a). In construing statutory language that is not explicit the legislative intent controls.

"When the words of a statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

"(1) The occasion and necessity for the statute,

"(2) The circumstances under which it was enacted,

"(3) The mischief to be remedied,

"(4) The object to be obtained,

"(5) The former law, if any, including other statutes upon the same or similar subjects,

"(6) The consequences of a particular interpretation,

"(7) The contemporaneous legislative history,

"(8) Legislative and administrative interpretations of such statute." 1 Pa.C.S. §1921(c).

The report of the Task Force on Sovereign Immunity of the Joint State Government Commission of the General Assembly (1977-1978) stated that the retention of sovereign immunity "assures that the commonwealth will not be required to process and defend various litigation brought against it in areas where risk management is totally uncertain." The language of the proposed medical-professional li-

ability exception was adopted verbatim by the legislature. Compare Report at 13 & 45 Pa.C.S. §8522 supra.

The task force recommended that "a statutory definition of health care providers is suggested by section 103 of the Health Care Services Malpractice Act of October 15, 1975, P.L. 390. "Commonwealth-employed health care providers are included within the act." Report at 13. "Health care provider" is defined in the Health Care Services Malpractice Act as "a . . . facility, institution or other entity licensed or approved by the commonwealth to provide health care or professional medical services as a . . . hospital, . . . and an officer, employee or agent of any of them acting in the course and scope of his employment." 40 P.S. §1301.103 (Purdon Supp. 1987).

In the definitions section of the chapter dealing with sovereign immunity, "employee" is defined "as any person . . . who has acted on behalf of a government unit . . . including any volunteer fireman and any elected or appointed officer. . . ." 42 Pa.C.S. §8501. The clear language of this section and section 103 of the Health Care Services Malpractice Act runs counter to defendants' argument that a person must be clinically licensed to be found negligent under the exception.

In *Steinberg v. Commonwealth of Pennsylvania, Department of Public Welfare*, 46 Pa. Commw. 105, 405 A.2d 1135 (1979), the only appellate case construing the language of the exception, the court interpreted the first category by looking at the type of services provided by the institution—in that case a youth detention center. In *Steinberg* an employee of the center brought suit against the commonwealth, an administrator, and a counselor, among others, for liability stemming from a sexual assault by one

of the "student-prisoners." Id. at 107-09, 405 A.2d 1136-37. The *Steinberg* court concluded that the youth detention center was not a "medical facility or institution" because its purpose was the rehabilitation of minors. Id. at 108, 405 A.2d at 1136-37. In the instant case, the function of a prison is certainly similar to that of a youth detention center. Yet, a prison *infirmary* clearly functions to deliver medical care to inmates and can, therefore, be distinguished from the prison as a whole. Moreover, the facts in *Steinberg* are inapposite to the case at bar.

The *Steinberg* court also construed the second category of potential defendants in the exception and applied the principle of ejusdem generis to narrow the scope of the term "health care personnel." 46 Pa. Commw. at 109, 405 A.2d at 1137. The court noted that plaintiff had not alleged that defendants were members of the enumerated professions or that they actually provided medical care. Id. Declining to adopt a "rigid definition" of the term, however, the court examined the functions that each of defendants performed and concluded that "counselors, social workers and administrators" at youth detention centers are not "related health care personnel" within the meaning of section 8522. Id.

In the instant case, a *health care* administrator would meet the *Steinberg* "function" test since defendant Morrash testified that his duties encompassed providing "health care benefits" to inmates pursuant to physicians' orders. In ascertaining legislative intent for the purpose of statutory construction, the practical results of a particular interpretation may be considered. *Lehigh Valley Co-op Farmers v. Commonwealth, Bureau of Employment Security, Department of Labor and Industry*, 498 Pa. 521, 526, 447 A.2d 948, 950 (1982). The General Assembly does not intend a result that is absurd

or unreasonable. *Zimmerman v. O'Bannon,* 497 Pa. 551, 556, 442 A.2d 674, 677 (1982). It would be absurd and unreasonable to allow a plaintiff to recover damages for the negligence of a licensed clinician in a more traditional health care delivery system but to deny recovery for the same injuries that result from the negligent conduct of a prison hospital administrator.

Thus, we have no difficulty in classifying a prison hospital as a "medical facility" and a hospital administrator as a "health care employee" or "related health care personnel." The negligent acts of a commonwealth prison health care administrator acting in the scope and course of his employment would not be immunized under the act. Therefore, the court's refusal to charge the jury on defendants' binding points for charge was proper. Conversely, a directed verdict or a new trial on the basis of sovereign immunity is not proper.

B. *Plaintiff's Failure To Sustain His Burden To Prove His Prima Facie Case Requires the Grant of Judgment Non Obstante Veredicto*

A defendant's motion for judgment n.o.v. will be granted where the evidence is insufficient to support a verdict for plaintiff. *Platt v. John Hancock Mutual Life Insurance Co.,* 361 Pa. 652, 66 A.2d 266 (1949); *McCloskey v. New York Life Insurance Co.,* 292 Pa. Super. 1, 436 A.2d 690 (1981). The necessary elements to maintain an action in negligence are:

"(1) A duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct. . . . (2) A failure on his part to conform to the standard required. (3) A reasonably close causal connection between the conduct and the resulting injury. . . . (4) Actual loss or damage resulting to the

interests of another." *Macina v. McAdams,* 280 Pa. Super. 115, 120, 421 A.2d 432, 434 (1985) (quoting Prosser, Law of Torts, §30 at 143 (4th ed. 1971)).

As the evidence now stands, plaintiff failed at trial to prove that Morrash had any duty under the law to provide the treatment plaintiff alleges was necessary or a sufficient causal connection between the conduct complained of and his subsequent injuries.

Plaintiff's theory of negligence against defendant Morrash is not based on medical malpractice. "Rather, it was a case regarding the negligent administration of medical treatment to plaintiff in light of his serious medical needs." Plaintiff did not challenge the propriety of the treatment that was ordered, but rather challenged the failure of defendant Morrash, in his capacity as chief health care administrator at SCIP, to follow his own "self-described responsibility to see to it that the doctor's orders were carried out."

Plaintiff has alleged that the negligence of defendants Morrash and the commonwealth consisted of the failure to provide him with adequate physical therapy, especially during a period of time when plaintiff was in solitary confinement for six days, and failure to provide him with adequate physical therapy equipment, including a special "eggcrate" mattress and his own wheelchair. The evidence that plaintiff presented in support of his negligent provision of medical care is insufficient as a matter of law based on three grounds. A jury cannot and should not infer negligence in a case such as this without some evidence that: (1) defendant Morrash had a legal duty to follow the recommendations of physicians outside of his institution, (2) some medical evidence that the care requested was necessary, and (3) that the care requested would have alleviated plaintiff's pain and suffering.

14

*(1) Defendant's legal duty to provide medical, care and equipment.*

Plaintiff himself states repeatedly in his brief that Morrash is legally required to follow doctor's orders in regard to an inmate's medical care. We agree with plaintiff that defendant Morrash's legal duty to provide medical and therapeutic care encompasses the implementation and facilitation of written and verbal orders given by the attending prison physician. It can hardly be contested that the attending physician is the professional responsible for designing and ordering a patient's regimen of medical care and for ordering treatments that comport with the standard of care. Thus, the prison physician's orders are material facts which must be proven in order for plaintiff to prove the lack of due care on Morrash's part in carrying out these orders.

Morrash testified that therapeutic decision regarding physical therapy are made by the prison physicians. Defendant Morrash testified that he did not hold any clincal licenses, college or medical degrees and that his job title was Chief Health Care Administrator for the infirmary at SCIP. He also testified that he does not make medical decisions to discharge patients from the hospital and that his duties are not to order treatment for inmates but to see that physicians' orders are carried out.

To establish what care was ordered plaintiff relied on documentary material in his prison file that consisted of a temporary medical transfer form from SCID authorized by an administrator from that facility and containing recommendations for care from the SCID prison physician, a physicians' consult from Dr. Chung, a physiatrist from outside the prison system, addressed to Dr. Gilberti, the SCIP physician; and the report of a physical done by Dr. Spitzer, an SCIP physician, dated 12/5/80, generat-

ed for the purpose of a possible commutation of plaintiff's sentence. While all of these reports are certainly evidence of suggestions or recommendations for plaintiff's medical care, none of them are probative of whether defendant Morrash had a duty to follow those medical recommendations made by physicians or others outside of the institution for purposes other than providing direct and immediate medical care.

Plaintiff did not present any evidence that would tend to prove that Morrash, rather than the physician responsible for plaintiff's care at SCIP, had a duty to interpret and implement recommendations made by other physicians not even directly involved in the plaintiff's care. In fact, plaintiff presented no evidence whatsoever on the actual content of the physician's orders.

Defendant Morrash testified that plaintiff's hospital records were "lost." Plaintiff submitted a motion in 1985 to compel defendants to supply the medical records. Defendant responded to the motion by providing certain "copies of medical information" to plaintiff, and the motion was denied as moot without prejudice to plaintiff's right to dispute the completeness of any responses. Plaintiff did not take any further action in this regard.

While we acknowledge that the commonwealth and the bureau may be at fault for not providing essential and discoverable material relevant to plaintiff's claim, plaintiff was at liberty to request further discovery, to file a motion to compel this information or to call witnesses such as Mr. Campeau, the physical therapist, and Dr. Gilberti, plaintiff's attending physician at SCIP, to present evidence on what care was actually ordered. Defendant Morrash was available at trial but plaintiff made no attempts to examine him on his knowledge of the actual physicians'.

orders that he was allegedly duty bound to follow.

Plaintiff also alleges that the equipment provided by the prison was inadequate to meet his medical needs and that his request to be transferred to a private rehabilitation facility was wrongfully denied. Plaintiff relies on Morrash's testimony that he would make every effort to assure that an inmate would get physical therapy *that had been ordered by a doctor,* even if it meant going outside of the prison. Morrash also testified that the prison facility had parallel bars, a whirlpool, and a contract physical therapist. Without evidence of what therapy was actually ordered and what additional equipment would be necessary pursuant to these orders the question of negligence should not have been submitted to the jury. Plaintiff presented no evidence at all on this question.

Finally, plaintiff argues that it was defendants' burden to produce Mr. Campeau, the physical therapist to rebut testimony from plaintiff that he received only four or five short visits. It is clear that there is a disputed factual issue over how much physical therapy plaintiff actually received. But the concept of the burden of proof must be distinguished from the duty to produce evidence at trial to make or meet a prima facie case. Defendant has no duty to go forward with evidence until plaintiff has met this burden. See 8 Standard Pennsylvania Practice 2d §49:44 (citations omitted).

Evidence of the quantity and quality of the physical therapy plaintiff actually received is certainly probative on the issue of whether defendant was negligent, but plaintiff first must meet his burden to prove all of the elements of his case, including the predicate material facts of the scope of defendant's duty. Without hearing evidence on the scope of defendant's duty, the jury is in no position to deter-

mine the credibility issues involved in the factual dispute and the reasonableness of defendant's behavior.

"It is axiomatic that a negligence claim cannot be maintained upon facts on which the law does not impose a duty." *Williams by Williams v. Lewis*, 319 Pa. Super. 552, 556, 466 A.2d 682, 683-84 (1983) (citing *Boyce v. United States Steel Corp.*, 446 Pa. 226, 285 A.2d 459 (1971); *Otto v. American Mutual Insurance Co.*, 241 Pa. Super. 423, 361 A.2d 815 (1976)). The initial determination of what duty a defendant owes plaintiff is a question of law and therfore, the responsibility of the trial court. *Wyke v. Ward,* 81 Pa. Commw. 392, 403-04, 474 A.2d 375, 381 (1984) (citing W. Prosser, Law of Torts 289 (4th ed. 1971)). "While we acknowledge that questions of negligence and causation are to be resolved by the jury, and not the judge, the question of the sufficiency of the evidence before presenting a question to the jury is clearly within the discretion of the trial judge. In fact the trial court has a duty to prevent questions from going to the jury which would require it to reach a verdict based on conjecture, surmise, guess or speculation." *Farnese v. SEPTA,* 338 Pa. Super. 130, 134, 487 A.2d 887, 890 (1985) (citing *Lecznski v. Pittsburgh Railways Co.,* 409 Pa. 102, 185 A.2d 538 (1962)).

Based on the evidence that was received, it was clearly not sufficient for the jury to find that defendant Morrash breached his duty to facilitate the plaintiff's prescribed medical care. The jury was speculating when it inferred that a certain course of physical therapy was necessary — a material fact implicit to the conclusion that defendant was negligent in failing to provide medical care or therapeutic equipment.

*Causation (2) necessity of the requested medical care and (3) alleviation of pain and suffering.*

In presenting his evidence about other allegedly necessary equipment, plaintiff relied mainly upon his own lay testimony and that of his mother that he needed his own wheelchair, and an "eggcrate" mattress, and that requests directed to defendant Morrash for these items were wrongfully denied. Plaintiff asserts that "[c]learly it was within the every day experience of the jury to be able to assess the reasonableness of these decisions."

While we agree with plaintiff's position that expert testimony is not necessary when the jury is capable of comprehending the facts and drawing correct conclusions from them, we conclude that the medical facts in this case are too complex to permit the jury to infer that defendant's conduct caused plaintiff additional pain and suffering without expert testimony. Plaintiff cannot hide behind his characterization of nonprofessional negligence when the gravamen of his allegations is that defendants denied him certain medical treatment and medically related equipment. Where a plaintiff alleges that certain medical treatment and therapeutic equipment is necessary to his care, we are reluctant to allow the jury to measure the reasonableness of the requested care by plaintiff's assertion of necessity alone.

In *Hamil v. Bashline,* the Supreme Court announced the type of proof necessary to prove the element of causation in personal injury cases:

"Normally a plaintiff may establish his case of causation with any evidence direct or circumstantial, which tends to show defendant's actions as the legal cause of his harm. Where, however, the ultimate determinations lie beyond the knowledge or expertise of the average lay person, expert testimo-

ny is permitted (and sometimes required) to aid the jury in its understanding of the factors involved and the teaching of the pertinent discipline with respect thereto. . . . Although in certain situations involving physical injury it is possible for a jury to reasonably infer causation from the circumstances of an accident or occurrence. . . *it is generally acknowledged that the complexities of the human body place questions as to the cause or pain or injury beyond the knowledge of the average layperson. . . . For a plaintiff to make out his cause of action in such a case, therefore, the law requires that expert medical testimony be employed.* In addition to its bearing on whether or not defendant's conduct was negligent, such testimony is needed to establish that the injury in question did, with a reasonable degree of medical certainty, stem from the negligent act alleged." 481 Pa. 256, 266-67, 392 A.2d 1280, 1285 (1978) (emphasis added).

The only medical testimony on the issue of the necessity of more intensive physical therapy was received from plaintiff's neurosurgical expert, Dr. Bruce Wilder. Dr. Wilder testified only that he would be in agreement with Dr. Chung's recommendation for "intensive physical therapy for four weeks as an inpatient or daily outpatient therapy." Dr. Wilder further stated that "this would have been a reasonable approach . . . and what [he] would have recommended at the time." He also went on to outline a more specific therapeutic regimen that he would have prescribed, which involved physical therapy only three times a week. Dr. Wilder did not testify to a reasonable medical certainty that any of the requested medical or therapeutic treatment was necessary or would have alleviated plaintiff's alleged pain, suffering or inconvenience.

Pursuant to Dr. Wilder's expert report, plaintiff's counsel conceded that Mr. Wareham is in no worse a position today than he would be if he had received "a million dollars worth" of physical therapy throughout the course of his recuperation. Plaintiff's counsel conceded that his claim for inadequate medical treatment involved no damages for direct physical injury, but only for additional pain and suffering.

Finally, plaintiff testified that he was put into solitary confinement at SCIP for six days immediately after discharge from the hospital unit on October 24, 1980. Plaintiff testified that, while in solitary, his requests for a blanket were refused, that he was unable to get out of bed except to go to the bathroom, that he had to eat his meals in the cell, and that he was denied a shower. The court instructed the jury that it was to consider this testimony only as it related to the claim for inadequate medical treatment.

In order to support this claim, one of the material facts plaintiff must prove is that he was prematurely discharged from the prison hospital unit. The decision to discharge a patient from medical care is clearly a question of professional judgment and is contrary to plaintiff's assertion that the jury could reasonably conclude that, "[either] Morrash, as administrator of the infirmary and presumably responsible for the inflow and outflow of its patients, or the commonwealth, Bureau of Corrections, acted unreasonably in permitting plaintiff to be so confined."

Although a reasonable person could easily find that even a healthy prisoner would have pain and suffering as a result of such treatment, the issue in a claim for inadequate medical care is whether this treatment was medically contraindicated at the time and, therefore, negligent. Plaintiff presented no evidence whatsoever on this issue. At the time of plain-

tiff's confinement in solitary, over two months had elapsed since the stabbing incident and it was approximately six weeks after admission to the hospital unit at SCIP. There was no medical testimony presented on whether such treatment was deleterious to plaintiff's progress or harmed him in any way. We have no testimony other than plaintiff's on the state of his physical health. From this testimony alone the jury was not capable of judging whether a reasonable, prudent person in defendant's position could impose disciplinary measures on an inmate in plaintiff's position.

Plaintiff did not present any medical testimony on any aspect of the alleged failure to provide a wheelchair or an "eggcrate" mattress. Before a jury can infer that the denial of this equipment is negligent, plaintiff must present some medical testimony that these items were medically necessary and that their denial caused him additional pain and suffering. Moreover, plaintiff's claim as regards the wheelchair is de minimus because he testified that he did have access to a prison wheelchair. One can always claim that, absent state-of-the-art equipment, one will suffer pain and inconvenience.

Because plaintiff has failed to meet his burden of proof on the prima facie elements of duty and causation, judgment non obstante veredicto is granted in favor of defendants. In view of the fact that defendants' motion for judgment n.o.v. has been granted, we do not reach the other exceptions raised in defendant's post-trial motions.[2]

---

2. Defendant has requested the court to grant entry of judgment n.o.v. on the section 1983 claim against defendants for failure to provide medical care. This issue is moot because the jury did not find against defendant on this claim.

## PLAINTIFF'S POST-TRIAL MOTIONS

Plaintiff seeks a new trial against defendants Larkins, Walters, Gabriel, Stepanik, the bureau and the commonwealth on the inadequate protection claims brought under 42 U.S.C. §1983; and judgment n.o.v. or a new trial against defendant Morrash on the section 1983 claim for inadequate medical treatment. Plaintiff also seeks delay damages. In support of his post-trial motion plaintiff argues that:

(1) The jury's answer to special interrogatory 7, that defendant Morrash was not acting within his authority under state law, was contrary to the uncontradicted evidence of defendant's admission that Joseph Morrash was an employee, agent or officer of the commonwealth and was error as a matter of law.

(2) A new trial is warranted based on the court's failure to charge the jury on plaintiff's submitted point for charge 3.

(3) The court erred in granting defendants' motion for summary judgment in favor of the commonwealth and the bureau, and plaintiff is entitled to a new trial on claims brought under 42 U.S.C. §1983 as to defendants Larkins, Gabriel, Walters, and the commonwealth of Pennsylvania, Bureau of Corrections because:

(a) The Sovereign Immunity Act does not immunize the conduct of a person acting under color of state law, which is found to be wrongful under 42 U.S.C. §1983.

(b) The Bureau of Corrections, commonwealth of Pennsylvania, fits within the definition of a "person" for purposes of 42 U.S.C. §1983.

(c) The record showed that there were disputed factual issues for the jury and required that defen-

dants' motion for summary judgment against the commonwealth parties be denied.

(4) The court erred in allowing testimony of plaintiff's criminal record to be admitted pursuant to *Carlson Mining Co. v. Titan Coal Co.*, 343 Pa. Super. 364, 494, A.2d 1127 (1985) and *Commonwealth v. Roots*, 482 Pa. 33, 393 A.2d 364 (1978).

 A. *The Jury's Finding That Defendant Morrash Acted Outside of His Authority Under State Law Was Not Contrary to the Uncontradicted Evidence and Was Not Error as a Matter of Law*

 B. *A New Trial Is Not Warranted Based on This Court's Refusal to Charge the Jury on Plaintiff's Submitted Point for Charge 3.*

Plaintiff argues that the jury's response to special interrogatory 7 was contrary to an admission in the pleadings, and uncontroverted evidence in the record, and requires the entry of judgment n.o.v. As an alternative argument, plaintiff contends that it was error for the court to refuse to charge the jury that "[t]he individual defendant Morrash was an employee of the commonwealth of Pennsylvania acting at all times in his capacity as employee of the state." Since these two exceptions are based on the same substantive issues, the court will treat them together.

Judgment notwithstanding the verdict is required when the jury's verdict is contrary to the clear, unequivocal evidence. *Fitzgerald v. McCutcheon*, 270 Pa. Super. 102, 410 A.2d 1270 (1979). A new trial should not be granted unless prejudice can be shown. *Williams v. Lumberman's Insurance Co.*, 332 Pa. 11, 1 A.2d 658, 662 (1938).

The interrogatories on the verdict slip that required the jury to make factual findings on plaintiff's section 1983 claim against defendant Morrash

are 6, 7, 8 and are set out with the jury's findings as follows:

"(6) Do you find that defendant, Joseph Morrash, was deliberately indifferent to a serious medical need of plaintiff's after he arrived at the State Correctional Institute at Pittsburgh?

Yes_____ No_____

"If you answered Yes to no. 6, go directly to no. 7. If you answered No, go to no. 9.

"(7) Do you find that defendant Morrash was acting within his authority under state law?

Yes_____ No_____

"If you answered Yes to no. 7, go directly to no. 8. If you answered No, go to no. 9.

"(8) Do you find that such conduct was a substantial factor in bringing about the plaintiff's harm?

Yes_____ No_____."

As originally drafted by the court, question 7 read: "Do you find that defendant Morrash was acting within his *lawful* authority under state law? . . . If you answered *'No'* to 7, go directly to 8. If you answered *'Yes'* go to 9." It should be pointed out that plaintiff objected to the language of the original version of this question several times during the course of the trial, although the notes of testimony requested by the parties include only one such instance. The court finally sustained the objection and changed the verdict slip to delete the word "lawful" and to reverse the position of "Yes" and "No" in the instruction on how to proceed. The jury did find that defendant Morrash had exceeded his authority, but because of plaintiff's counsel's strenuous insistence that it would be "confused" by the interrogatory the language was changed in accord with counsel's objection.

Plaintiff now complains that the jury erred in responding to the interrogatory in finding that defendant was not acting within the scope of his authority under state law. Plaintiff bases this argument on defendants' answer to plaintiff's complaint, wherein it was admitted that "Morrash was an agent, servant and employee of the Bureau of Corrections, commonwealth of Pennsylvania." This admission was read to the jury and was uncontroverted by defendants. Plaintiff also argues that, because the court refused to give the requested point for charge, the jury failed to heed the uncontroverted admission of defendants evidenced by the negative answer to the interrogatory.

First of all, plaintiff confuses an admission of common law agency with the requirement under federal law that plaintiff prove that he was deprived of liberty without "due process of law." 42 U.S.C. §1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia, subjects, or causes to be subject, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunity secured by the Constitution and laws, shall be liable to the person injured in any action at law, suit in equity, or other proceeding for a redress."

In construing this statute as it governs plaintiff's burden of proof courts have generally implied a requirement that this deprivation of rights be shown to be without due process of law:

"To be deprived of liberty 'without due process of law' means to be deprived of liberty without authority of the law. Before the jury can determine, then, whether or not plaintiff was deprived by defendants

of any of his liberty under the federal Constitution, 'without due process of law,' the jury must first determine, from a preponderance of the evidence in the case, whether the defendants knowingly did the acts alleged and, if so, *whether, under the circumstances shown by the evidence in the case, defendants acted within or without the bounds of their lawful authority under state law.*

"For if defendants acted within the limits of their lawful authority under state law, then the defendants could not have deprived the plaintiff of any liberty 'without due process of law,' since the court finds and instructs you that the state law applicable in this case meets the requirements of the federal Constitution." 111 Devitt & Blackmar, Federal Jury Practice and Instructions §92.11 (3d ed. 1977) (emphasis added).

This is essentially the same instruction that the court gave the jury on the issue of lawful authority.

"The law states that if defendant acted within the limits of their [sic] lawful authority under state law, then defendants could not have deprived plaintiff of any liberty without the due process of law, since the court finds and instructs you that the state law applicable to this case meets the requirements of the federal constitution."

The converse of this instruction is, that if defendants acted outside of their lawful authority, then they deprived plaintiff of rights without due process of law. The jury was also instructed that the defendants had "the lawful authority, indeed the lawful duty under state law . . . to give needed medical treatment." Plaintiff argues that the court's instruction confused the jury.

Plaintiff is correct in his assertion that the agency question is relevant to the "under color of state law" analysis.

"In order for *unlawful acts* of an official to be done 'under color of any law,' . . . the unlawful acts must be done while the official is purporting or pretending to act in the performance of his official duties, that is to say, the unlawful acts must consist in an abuse or misuse of power which is possessed by the official only because he is an official, and the unlawful acts must be of such a nature, and be committed under such circumstances, that they would not have occurred but for the fact that the person committing them was an official, purporting to exercise his official powers." 111 Devitt & Blackmar, Federal Jury Practice and Instructions §92.08 (3d ed. 1977) (emphasis added).

So the determination of whether the acts are lawful or unlawful is a different question from whether the official is performing his duties officially, i.e. the common law agency question. Therefore, the commonwealth defendants' admission that Morrash was the agent, servant or employee of the bureau is relevant to the "under color of state law" analysis, but is not conclusive on whether the individual defendant exceeded the bounds of his lawful authority.

Plaintiff argues that "as a practical matter, regardless of whether the acts were authorized they were still under color of state law and thus actionable under 42 U.S.C. §1983." *Fitzgerald*, however, was an action in trespass against the city and an "off-duty" policeman. There were no allegations that federal civil rights had been violated. Id. at 104, 410 A.2d at 1271-72. The Superior Court discussed only the scope of the policeman's employment and there was no discussion whatsoever of whether the policeman violated due process of law. Since the issue in *Fitzgerald* was clearly the agency question only, the case is not on point for our purposes.

In *Parratt v. Taylor* the Supreme Court stated that "in any section 1983 action the initial inquiry must focus on whether the two essential elements to a section 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law, and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." 451 U.S. 527, 535 (1981). This second element encompasses the due process analysis. Id. at 537. The *Parratt* court also noted that, "in situations arising out of the misconduct of state officers, even though there is action 'under color of state law' sufficient to bring the [14th] Amendment into play, the state action is not necessarily complete." Id. at 542 (citations omitted).

Although Justice Rehnquist's opinion in *Parratt* dealt with the procedural due process implications under the 14th Amendment of depriving an inmate of property rights, the court did not limit its two-pronged analysis only to cases alleging similar violations. Plaintiff cites *Parratt* for the proposition that harmful conduct by state employees in high positions satisfies the "under color of state law" requirement. It is clear from the foregoing that there are two analytical prongs to a prima facie case of violation of federal civil rights—one of which deals with the "under color of state law" analysis and the other encompassing "due process of law."

The effect of introducing admissions in pleadings is to bind both parties. *Dental Manufacturing Supply Co. v. Southern Railway*, 82 Pa. Super. 558 (1924). The party making the offer is relieved from the necessity of further proof in the matter. *Mellon National Bank v. People's Bank of California*, 226 Pa. 261, 75 Atl. 363 (1910) (plaintiff's prima facie case required no additional proof and called for

binding instructions). Thus, if question 7 dealt with issue of agency under color of state law, which it did not, it would have been error to submit it to the jury for a factual determination. Futhermore, the record shows that the court instructed the jury not to consider the agency question. "As to the . . . negligence claim, it's agreed that if Mr. Morrash is responsible, then the commonwealth is responsible in that isolated circumstance only. . . . We have not asked you questions about that because we have reached an agreement in that regard."

Plaintiff's exception to the court's failure to charge on point for charge 3 is without merit. From the foregoing it is clear that the court's charge properly went only to the issue of whether defendant acted within the limits of his lawful authority. Therefore the jury made a neccessary factual determination with regard to this issue, because the evidence was *not* uncontroverted on this element.

Furthermore, plaintiff did not properly preserve an exception to the court's refusal to charge on 3. The record shows that the court refused to read plaintiff's proposed charges 1 through 22, verbatim. A blanket request to read all or the majority of a party's charges arises to nothing more than a general exception. Plaintiff also asked specifically that the commonwealth and the Bureau of Corrections be added to the verdict slip so that the jury could decide whether either of those entities were negligent in their own right. From the ensuing discussion in chambers and after reviewing plaintiff's complaint, it is clear that the commonwealth and the bureau were alleged to be negligent only on a theory of respondeat superior. In response to this request the court did instruct the jury that "it's agreed that if Mr. Morrash is responsible, it is also acknowledged that the commonwealth is responsible." There was

never any specific exception to the court's refusal to charge on the agency issue as plaintiff requested in point 3.

Finally, the jury followed the instructions on the verdict slip very carefully. Although we have serious reservations about the way the interrogatory was finally articulated, it must be pointed out that this is what plaintiff insisted upon. Had the verdict slip remained as originally drafted, liability would have flowed when the jury answered interrogatory 7 in the negative since it would have proceeded to the substantial factor question. Plaintiff's counsel had a very significant role in drafting these instructions and cannot now complain that the jury properly followed the instructions or that the instructions were improperly drafted.

It is a basic rule of trial practice that a party cannot later complain of errors and irregularities that were not brought to the attention of the court and the opposing party at the time of the trial. 10 Standard Pennsylvania Practice 2d §62.77 (1982). Plaintiff had his objection to the original language of the verdict slip sustained. Therefore, the court rightly concluded that the error he complained of had been remedied. He cannot now raise an exception to his own version of the interrogatory in post-trial motions. The jury's answer to interrogatory 7 was not erroneous based on the evidence, nor was it error as a matter of law. The record shows that the court did instruct the jury not to consider the agency issue and, therefore, neither of these exceptions requires the grant of a new trial or judgment n.o.v.

As a final point, notwithstanding any errors in the instructions, plaintiff's section 1983 claim for inadequate medical care should never have gone to the jury. If there was not enough evidence to satisfy the negligence claim, then there certainly was not

enough evidence to satisfy a claim that there was a constitutional violation. We are in agreement with federal courts and courts of other jurisdictions which have held that a prisoner is not the ultimate judge of what medical treatment is proper and necessary, and claims based on differences of opinion between the inmate and the prison staff about what medical care is required do not state a constitutional question absent exceptional circumstances. See e.g., *Estelle v. Gamble*, 429 U.S. 97, 107-08 (1976) (inmate's suggestions about medical treatment and diagnostic options might have been in order but were classic examples of matters for medical judgment); *Medcalf v. Kansas*, 626 F. Supp. 1179, 1182 (D.C. Kansas 1986) (improper or inadequate medical care must be continuing; must not be supported by any competent, recognized school of medical practice; and must amount to denial of needed medical treatment); *Holly v. Rapone*, 476 F. Supp. 226, 233 (E.D. Pa. 1979) (inmate of correctional institution has no constitutional right to requested medical treatment); *Bishop v. Circuit Court of Cole County*, 702 S.W.2d 554 (Mo. App. 1985).

In *Medcalf*, the court found that the inmate's allegations that he had requested certain medical care and diagnostic tests stated a cause of action because he presented expert testimony to prove the medical necessity of the requested care, 626 F. Supp. at 1183-84. The essence of plaintiff's section 1983 claim is, not that all medical care was denied, but that he did not receive enough medical care as measured by lay testimony. Plaintiff presented no expert testimony that, to a reasonable medical certainty, any of the care or equipment he requested was necessary.

Plaintiff's care clearly did not amount to a denial of medical treatment because he himself testified

that, in relation to the injuries that resulted from the stabbing, he had seen and been treated by several physicians and a physical therapist, had received physical therapy and an ankle brace, had medication prescribed and administered, and had been admitted to a hospital for acute care, and the SCIP hospital unit for intermediate care.

C. *A New Trial on Claims Brought Under 42 U.S.C. §1983 as to Defendants Larkins, Walters, Gabriel, Stepanik, and the Commonwealth of Pennsylvania, Bureau of Corrections Is Not Warranted*

(1) *Plaintiff had an opportunity to present his case against individual defendants and has not established that he was prejudiced in any way.*

Plaintiff has not stated in his memorandum of law the grounds upon which he bases his motion for a new trial against Larkins, Walters, Gabriel and Stepanik. He asserts only that a new trial should be granted "to avoid substantial injustice" and to cure "substantial prejudice." Plaintiff's motion with respect to these defendants is, therefore, denied since he has not stated any particular reasons for why he believes that he was prejudiced.

(2) *The court did not err in granting defendants' motion for summary judgment in favor of the commonwealth and bureau on claims arising under section 1983 because Pennsylvania's Sovereign Immunity Act immunizes the state and its agencies from suit for federal civil rights violations and Pennsylvania is not a "person" that can be sued for damages under 42 U.S.C. §1983.*

Plaintiff also argues that the dismissal of the commonwealth, Bureau of Corrections prejudiced him at trial and requires the grant of a new trial. As above, plaintiff has not properly stated any grounds

for the allegation that he was prejudiced by the grant of the motion for summary judgment in favor of defendants on the section 1983 inadequate protection claim.

In order to obtain a new trial a party must establish that some prejudice or injury resulted from the verdict or ruling in the previous trial. *Pollock Industries Inc. v. General Steel Castings Corp.*, 203 Pa. Super. 453, 201 A.2d 606, 612 (1964) (adopting opinion at 33 D.&C.2d 383, 392) (error complained of must prejudice party in jury's eyes preventing just and fair decision). Plaintiff had an opportunity to present his evidence against the individual defendants on this claim and he has not alleged that the evidence would have been any different or that he would have had any greater chance of success in proving this claim if the motion had not been granted in favor of the institutional defendants. Nevertheless, we will discuss the bases for the court's decision to rule against plaintiff on the motion for summary judgment.

42 U.S.C. §1983 provides:

"Every *person* who, under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia, subjects, or causes to be subject, any citizen of the United States or other persons within the jurisdiction thereof due to the deprivation of any rights, privileges, or immunity secured by the Constitution and laws, shall be liable to the person injured in any action at law, suit in equity, or other proceeding for a redress." (emphasis added).

The analysis of whether a state is a "person" that can be sued under this statute is integral to the determination of whether sovereign immunity applies.

Plaintiff cites *Martinez v. California,* 444 U.S. 277 (1980), and *Monell v. Department of Social Ser-*

*vices,* 436 U.S. 658 (1978) for the proposition that state sovereign immunity laws cannot immunize conduct of a person acting under color of state law, which is wrongful under 42 U.S.C. §1983. But the *Monell* court only decided that municipalities and counties are "persons" who can be sued under section 1983. The court stated that "[o]ur holding today is, of course, limited to local government units which are not considered part of the state for 11th Amendment purposes." 436 U.S. at 690 n. 54.

The *Martinez* court stated that, "We have never considered, however, the question whether a state *must* entertain a claim under section 1983. We note that where the same type of claim, if arising under state law, would be enforced in the state courts, the state courts are generally not free to refuse enforcement of the federal claim." 444 U.S. at 283 n. 7 (emphasis in original). The key language is whether the state's own tort claims legislation permits "the same type of claim" to be brought in state courts. The *Martinez* court was not presented with the issue of personhood as it applied to a state because California was sued under common law negligence in that case, not under section 1983. 35 Cal. App. 3d 430, 435, 149 Cal. Rptr. 519, 523 (1978).

The *Martinez* court went on to discuss the application of California's immunity statute to the *individual* parole officers who were being sued under section 1983, holding that the immunity statute would not control the claim even though a federal cause of action was being asserted in state court. Id. at 248. The court stated that, "Conduct by *persons* acting under color of state law which is wrongful under 42 U.S.C. §1983 . . . cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guaran-

tee into an illusory promise, and the supremacy clause of the Constitution insures that the proper construction may be enforced." Id. n. 8 (emphasis added).

Therefore, reading *Martinez* and *Monell* together, we conclude that, while a state immunity statute may not immunize wrongful conduct of individual state officers, municipalities or counties from claims brought under section 1983, the state may still be immune from suits brought in its own courts by virtue of its own tort claims act.

The Pennsylvania Sovereign Immunity Act waives immunity for "damages arising out of a *negligent* act" involving eight very narrow exceptions or waivers of immunity. 42 Pa.C.S. §8522 (Purdon 1982) (emphasis added). In *Kapil v. Association of Pennsylvania State Colleges and Universities,* 68 Pa. Commw. 287, 448 A.2d 717, 720-21 (1983), the court held that a state's own courts may not entertain a damages action under the federal civil rights statute against a state or its agencies unless the state had waived sovereign immunity. Id. The Supreme Court reversed the Commonwealth Court because the cause of action arose during that period when sovereign immunity had been judicially abrogated. *Kapil v. Association of Pennsylvania State Colleges and Universities,* 504 Pa. 92, 470 A.2d 482 (1983). The *Kapil* court stated that the cause of action asserted by plaintiff did not fall within any of the eight exceptions to the act and noted that *it would have been barred* if the immunity of the act was otherwise applicable. Id. at 97-98, 470 A.2d at 484-85.

This observation was dictum, but it appears to be a clear statement of the fate of other section 1983 actions that have accrued after sovereign immunity was legislatively re-established and do not fall with-

in one of the eight narrow exceptions. Plaintiff has already conceded that, for purposes of the negligence claim for inadequate protection against individual and institutional defendants based on the same set of facts, the action does not fall within any of the eight exceptions to sovereign immunity in 42 Pa.C.S. §8522.

In *Picariello v. Commonwealth*, 54 Pa. Commw. 252, 421 A.2d 477 (1980), the court concluded that certain intentional torts were not within any of the eight enumerated exceptions to sovereign immunity. Id. at 479. The Picariello court cited the Report of the Joint State Government Commission of the General Assembly on Sovereign Immunity (1977-1978) Id. n. 8. The report noted that the "task force specifically rejected waiving sovereign immunity for claims arising out of . . . civil rights and constitutional violations." Report at 15. Reading the case law and the legislative history together, this court concludes that the commonwealth has not waived sovereign immunity for civil rights violations, federal or otherwise.

Furthermore, although the question whether a state is a person for purposes of 42 U.S.C. §1983 has never been ruled on by a Pennsylvania appellate court, there are numerous federal district and circuit decisions from Pennsylvania that have held that a state is not a person for purposes of defending a section 1983 damages action. See e.g., *Curtis v. Everette*, 489 F.2d 516 (3rd Cir. 1973) (commonwealth and Bureau of Corrections not "persons" for purposes of section 1983), cert. denied, *Smith v. Curtis*, 416 U.S. 985 (1974); *Mattas v. Supreme Court of Pennsylvania*, 576 F.Supp. 1178 (W.D. Pa. 1983) (post-*Monell* case held Pennsylvania is not "person").

. The 11th Amendment bars litigation of claims against states in federal courts without their consent, even if the claim is presented under section 1983. See *Quern v. Jordan,* 440 U.S. 332, 340 (1979) (citing *Alabama v. Pugh,* 438 U.S. 781 (1976)). The Supreme Court in *Quern* held that, "[S]uit in federal court by private parties seeking to impose a liability, which must be paid by public funds in the state treasury, is barred by the 11th Amendment." 440 U.S. at 337 (citing *Edelman v. Jordan,* 415 U.S. 651, 653 (1974)). The *Quern* court also emphasized that the *Monell* court had not cast any doubt on this holding. 440 U.S. at 338. This is contrary to plaintiff's contention that cases such as *Curtis v. Everette* are no longer dispositive of the issue after *Monell.*

Although plaintiff has cited several federal decisions holding that a state is a person that may be sued in federal court for money damages under section 1983, none of those courts were interpreting section 1983 as it applies to Pennsylvania. Moreover, those courts first looked at whether the state had waived 11th Amendment immunity under the state's own tort claims acts. See *Della Grotta v. Rhode Island,* 781 F.2d 343 (1st Cir. 1986) (state that has waived 11th Amendment immunity is "person" for section 1983 purposes); *Irwin v. Calhoun,* 522 F. Supp. 576 (D. Mass. 1981) (Congress intended to include states within class of defendants under section 1983, but only to extent compatible with 11th Amendment immunity); *Marrapese v. Rhode Island,* 500 F.Supp. 1207 (D.C.R.I. 1980) (state waived 11th Amendment immunity via tort claims statute that unambiguously consented to tort suits without jurisdictional restriction).

The applicability of these cases to a section 1983 claim brought in a Pennsylvania state court is

unclear because (1) federal courts have uniformly construed section 1983 to mean that Pennsylvania is not a "person" under section 1983, and (2) 11th Amendment immunity is not even implicated in state court actions. *Maine v. Thiboutot,* 448 U.S. 1, 9 n. 7 (1980). "No 11th Amendment immunity is present . . . where an action is brought in state court since the amendment, by its terms, restrains only the judicial power of the United States." Id.

Plaintiff's argument that, absent the bar of the 11th Amendment, a state can be a "person" for purposes of section 1983 has some precedential support and logical appeal. We do not have, however, any guidance from Pennsylvania appellate courts on this issue, so we will defer to federal court interpretation of federal law. Cf. *Palmer v. Penn-Ohio Road Materials Inc.,* 462 F.Supp 312 (W.D. Pa. 1978) (Pennsylvania's sovereign immunity statute especially preserved commonwealth's 11th Amendment immunity). We also take guidance from the dicta in *Martinez* stating that a section 1983 litigation against a state in *state* court should be governed by whether a state would enforce a particular cause of action under state law. The answer in Pennsylvania is in the negative.

Therefore, there was no genuine issue of material fact for the jury to resolve regarding the commonwealth, Bureau of Correction's liability for inadequate protection under 42 U.S.C. §1983, because we hold as a matter of law that the commonwealth and its agency are immune from civil rights claims.

(2) *The Court Did Not Err in Allowing the Jury to Hear a Summary of the Number of Convictions for Which Plaintiff Is Incarcerated*

Plaintiff claims that he was prejudiced because defense counsel was permitted to read to the jury a

summary of plaintiff's felony convictions, which arose out of three distinct criminal episodes. He argues that the prejudicial value of the evidence outweighed the probative value, because other evidence of prior convictions had already been heard by the jury. Id. Plaintiff cites *Commonwealth v. Roots*, 482 Pa. 33, 393 A.2d 364 (1978) and *Carlson Mining Co. v. Titan Coal Co.*, 343 Pa. Super. 364, 494 A.2d 1127 (1985) for support.

In *Carlson* the Superior Court announced the rule that prior criminal convictions may be used in civil cases to impeach a witness' credibility. 343 Pa. Super. at 371, 494 A.2d at 1129. The issue raised by plaintiff, however, is analytically different from whether prior criminal convictions can be used to impeach credibility. The issue at bar is whether defendants can bring out evidence of prior criminal convictions to rebut plaintiff's claim that he would be employable upon release from prison, absent his present physical injuries.

Initially, and in response to plaintiff's motion in limine to preclude the admissibility of the convictions for certain sex offenses, the court ruled that defense counsel would be limited to cross-examining plaintiff about his convictions for robbery, theft of moving property, and theft of receiving stolen property because they are crimen falsi, and that the jury would be informed that these convictions arose out of one incident. In plaintiff's motion in limine, he argued only that evidence of "the felony[s] of rape, deviate sexual intercourse, [and] terroristic threats be excluded" because they are not crimen falsi. He acknowledged that crimen falsi are admissible for impeachment purposes. Id. at 2. Subsequent to the court's ruling on this issue, plaintiff's counsel himself examined plaintiff on these convictions:

"Mr. DeCaro: Please just answer yes or no. Am I correct that you're serving your prison sentence on a conviction of robbery, theft of receiving stolen property, and theft of a motor vehicle?

"Plaintiff: Yes." Id. 88. Defense counsel did not cross-examine plaintiff on these convictions.

Later in direct testimony, plaintiff testified that his father would have been able to get him into the Teamsters' Union so that he could eventually drive a truck. Id. 89. Defense counsel argued that this second episode opened the door to cross-examination on all convictions, and would permit the jury to infer incorrectly that plaintiff had been convicted only of three crimes. Id. 90. The court deferred ruling on defense counsel's request but did instruct the jury that:

"In accordance with a prior ruling, I allowed you to hear the fact that [Mr. Wareham] was convicted of a robbery, . . . theft, and receiving stolen property. These three crimes are what we call crimen falsi, and the jury can determine whether that would have an effect on whether the person is capable of lying under oath or not.

"That's not the only reason that those convictions are of concern to you in this case. By inadvertance, I believe, the way the question was asked, it was suggested that's what Mr. Wareham is doing time for. The fact that he is doing time for other crimes which I won't even get into or the fact that he is doing time for these crimes has no bearing on the case itself.

"The only thing that you are concerned with with respect to the crimes is, does the fact of the conviction of crimen falsi indicate that he is less likely to tell the truth under oath than someone else or not. You don't have to go into what else he is in prison for, because it has no bearing on these claims."

Two days later, defense counsel asked the court for permission to introduce the total number, but not the type, of convictions because this evidence was relevant to plaintiff's employability. The court ruled on this request by carefully limiting counsel's summary to "three criminal episodes, if that is the actual number, one of which resulted in [for example] conviction for two felonies and one misdemeanor, one of which resulted in one felony, and one misdemeanor, whatever, and the third of which resulted in whatever it resulted in. That's the fairest way I know how to do it." Id. 93.

The court refused to permit the jury to hear any reference to the character of the specific crimes — other than the crimen falsi previously discussed since hearing evidence that plaintiff had committed sex offenses and other violent crimes may have inflamed the jury. Id. 88-93. Therefore, this evidence was admitted not to impeach plaintiff's credibility, but for its relevance to the issue of damages — plaintiff's future employability. Therefore, *Carlson, Roots* and the cases cited therein are not applicable here.

The jury was already aware that plaintiff had been incarcerated for over 10 years at the time of the trial and could fairly assume that he was serving time for serious felonies. This court carefully considered all arguments on the issue of prior convictions and strictly limited defendants' summary of the evidence. Nor is plaintiff able to demonstrate any real prejudice in the jury's eyes resulting from the admission of this evidence, because the jury found for plaintiff on one of his claims.

In light of our agreement with defendants' position, that they were entitled to rebut plaintiff's evidence of employability, and keeping in mind the need to protect plaintiff's interest against any undue

prejudice in the eyes of the jury, we believe that a fair compromise was achieved here and there was no error in admitting the brief enumeration of plaintiff's prior convictions based on their relevance to his future employability.

## CONCLUSION

Pursuant to all of the above, we hold that defendants' post-trial motion for judgment non obstante veredicto is granted and plaintiff's post-trial motions are denied. In view of the foregoing, plaintiff's post-trial motion for delay damages is moot.